341 So.2d 46 (1976)
Anthony PANEK, Jr., et ux., Plaintiffs-Appellees-Appellants,
v.
GULF INSURANCE COMPANY et al., Defendants-Appellants.
No. 5745.
Court of Appeal of Louisiana, Third Circuit.
December 21, 1976.
Rehearing Denied January 26, 1977.
*48 Gist, Methvin & Trimble by James T. Trimble, Jr., Alexandria, for defendant-appellant-appellee.
Bernard Kramer, Alexandria, for plaintiff-appellee.
Grove Stafford of Stafford, Randow, O'Neal & Scott, Alexandria, Hall, Coltharp & Lestage by David Lestage, DeRidder, for defendant-appellee.
Before CULPEPPER, WATSON and GUIDRY, JJ.
GUIDRY, Judge.
Anthony Panek Jr. and Linda Bowen Panek, husband and wife, instituted this suit seeking to recover special and general damages incurred as a result of injuries sustained in a motor vehicle accident which occurred July 31, 1974 on Louisiana Highway 1.
The facts surrounding the accident which gives rise to this litigation are not disputed and are accurately set forth in the trial judge's reasons for judgment as follows:
"On July 31, 1974, Linda Panek was driving a 1971 Volkswagen van in a southerly direction on Louisiana Highway 1 immediately adjacent to the Rapides Golf and Country Club. Her husband, Anthony Panek, Jr., was a passenger in the van. As the van approached a northbound truck and trailer owned by Bodcaw Company and being driven by one of its employees, the left front dual tandem of the trailer came off of the axle, crossed the centerline, and slammed into the front of the van. The trailer from which the wheel became detached was originally manufactured by Pullman, Inc., under the trade name Trailmobile, Inc., in 1965. It came into the ownership of the defendant, Fruehauf Corporation, on February 5, 1974. Subsequently, Fruehauf sold the trailer to Bodcaw after making certain modifications and repairs. These modifications and repairs consisted of the cutting of six vents in the side and front of the trailer, installing corrugated steel in the roof and a top swinging door. All of the brake shoes were relined and the oil seals and some brake shoe parts were replaced."
The following parties were joined as defendants: Marshall E. Robbins, driver of the truck; Bodcaw Company and its insurer, Gulf Insurance Company (hereafter sometimes collectively referred to as "Bodcaw-Gulf"); Fruehauf Corporation and its insurer, Continental Casualty Company (hereafter sometimes collectively referred to as "Fruehauf-Continental"); and, Pullman, Inc. Marshall E. Robbins, Bodcaw Company and Gulf Insurance Company filed a third party demand seeking indemnity and/or contribution from Fruehauf Corporation, Continental Casualty Company and Pullman, Inc. Fruehauf Corporation and Continental Casualty Company filed a third party demand seeking indemnity and/or contribution from Pullman, Inc.
The contentions of the several defendants-third party plaintiffs are succinctly set forth in the trial court's reasons as follows:
"The defendants agree that the Paneks are entitled to recover for the injuries which they received in this accident. However, they understandably disagree as to which of them is liable. Bodcaw argues that it purchased the truck from Fruehauf and that the wheel came off through no fault of its own. It argues that the accident was caused because Fruehauf failed to tighten the jam nut when it replaced the wheels after relining the brakes and/or that the assembly intended to hold the wheel on the axle was defectively designed by Pullman and/or Fruehauf. Fruehauf denies that there is sufficient evidence to establish that it failed to tighten the jam nut and blames the accident on Pullman's defective design and/or Bodcaw's failure to properly *49 maintain and inspect the trailer. Pullman defends the design and contends the sole reason for the wheel coming off was someone's failure to properly tighten the jam nut. Pullman also argues that even if the design is defective, Fruehauf remanufactured the trailer prior to selling it to Bodcaw and that Fruehauf's failure to correct any defect is an intervening cause which would relieve Pullman from liability."
After trial on the merits the district court, for written reasons assigned, found Fruehauf's negligence to be the sole proximate cause of the accident but determined that Bodcaw-Gulf were solidarily liable with Fruehauf-Continental under R.C.C. Article 2317. Accordingly, the trial court rendered judgment as follows:
(a) in favor of Anthony Panek Jr., against Bodcaw Company, Gulf Insurance Company, Fruehauf Corporation and Continental Casualty Company, in solido, for the principal sum of $15,051.52;
(b) in favor of Linda Bowen Panek against Bodcaw Company, Gulf Insurance Company, Fruehauf Corporation and Continental Casualty Company in solido, for the principal sum of $80,000.00;
(c) in favor of Marshall E. Robbins and Pullman, Inc., against plaintiffs dismissing the latter's demand against these defendants;
(d) in favor of Pullman, Inc., and against Marshall E. Robbins, Bodcaw Company, Gulf Insurance Company, Fruehauf Corporation and Continental Casualty Company, dismissing the third party demands of the latter against the former; and, (e) in favor of Bodcaw Company and Gulf Insurance Company against Fruehauf Corporation and Continental Casualty Company, in solido, indemnifying Bodcaw and Gulf for all amounts for which they were cast, including court cost.
Bodcaw-Gulf have appealed and urge that: (1) the trial court erred in finding strict liability of Bodcaw Company and its insurer under R.C.C. Article 2317; (2) in the alternative, in the event this court should find that Bodcaw is liable and not entitled to indemnity from Fruehauf Corporation and its insurer, in relieving Pullman, Inc., of negligence; and, (3) in awarding excessive general damages to Linda Bowen Panek.
Fruehauf Corporation and Continental Casualty Company have appealed and urge that the trial court erred: (1) in finding Fruehauf Corporation negligent; (2) in not finding Bodcaw Company and its insurer liable under the doctrine of res ipsa loquitur; (3) in allowing Bodcaw-Gulf indemnity over against Fruehauf-Continental; (4) in finding strict liability of Bodcaw Company and its insurer under R.C.C. Article 2317; (5) in failing to hold Pullman, Inc. negligent; and, (6) in awarding excessive general damages to Linda Bowen Panek.
Plaintiffs also appeal, however, not because they felt aggrieved by the trial court judgment but rather as a precautionary measure in the event this court should amend the trial court judgment so as to cast Pullman, Inc.
The trial court in a comprehensive and well reasoned opinion correctly disposed of all the issues presented in this case, except the issue as to the liability of Bodcaw-Gulf under R.C.C. Article 2317. We adopt the opinion of the learned trial judge as our own in disposing of all issues presented by this appeal excepting the latter issue.

"BODCAW'S LIABILITY
The driver of the tractor-trailer involved in the accident was Marshall Robbins, a Bodcaw employee. The tractor was owned by Bodcaw. As stated earlier, Bodcaw purchased the trailer from Fruehauf on February 5, 1974. Fruehauf had reconditioned the trailer and modified it so that it could be used for hauling wood chips from a forest area to the Pineville Kraft Paper Mill. The trailer had been used for this purpose and had been driven some 10,000 miles by Bodcaw employees. The testimony of several Bodcaw employees was to the effect that the wheel in question had not been removed since the trailer was purchased from Fruehauf. They testified that *50 irregular but fairly frequent visual inspections were made of the trailer and that occasionally the wheels were jacked up and shaken manually to check for looseness. This shaking was primarily intended to check the condition of the bearings. The oil level in the axle was checked either by visual inspection through a transparent portion of the hub or by removing a rubber plug in the center of the hub. The jam nut was never inspected. However, there is no evidence that the manufacturer's recommended inspection and maintenance procedures required such an inspection nor is there any testimony that such inspections are customarily performed in the trucking industry. Therefore, the Court is unable to find that Bodcaw was negligent in failing to remove the hubcap and tighten the jam nut.
It is also contended that there would have been sufficient noise and vibration to warn the Bodcaw driver that the wheel was loose and about to come off and that he was negligent in failing to discover and remedy the situation. The wheel in question was on two sets of bearings. The bearings were held in place by a positioning nut. A perforated lock washer was then installed against the positioning nut. Finally, a jam nut was installed to hold the perforated lock washer in position. The jam nut must maintain the perforated lock washer against the positioning nut in order to prevent the positioning nut from loosening. It is conceded that the jam nut on the wheel in question came off thereby permitting the lock washer to disengage itself from the positioning nut which allowed the positioning nut and wheel to come off. It is not contended that any of the parts just discussed contained manufacturing defects. On the contrary, all of the experts agreed that these parts were in good condition and could be reused. It appears that the jam nut in question came off and remained in the hubcap for a period of time prior to the accident. This is indicated by the scarring on the interior of the hubcap. However, the degree of damage to the interior of the hubcap indicated that the jam nut came off a relatively short time prior to the accident. The experts could not predict with certainty how long the trailer could be operated without the jam nut before the perforated lock washer would disengage from the positioning nut. They generally agreed that very little vibration or shock would be required to disengage the lock washer. It was also generally conceded that once the lack washer was disengaged the positioning nut would unscrew fairly quickly and allow the wheel to come off.
There are two things which could have warned the driver of the truck that the wheel was about to come off. As soon as the positioning nut began to loosen, thus permitting the wheel to move outward, an interior oil seal was broken and the oil in the axle was permitted to escape. As the wheel moved outward on the axle it could have wobbled causing vibrations which the driver might have detected. The testimony indicates that the wheel would have a tendency to continue to rotate normally until just before it came off the axle. The driver testified that he observed the wheel in question while making a turn when he was leaving the Pineville Kraft Plant. He stated that he noticed nothing unusual about the wheel at that time. He also testified that nothing occurred that would warn him that the wheel would come off during the return trip to the chipper location and that he was unaware that it had come off until he was informed of that fact at the end of the return trip. Considering the normal bounce of the empty trailer, the rattle of the metal shield on the interior roof of the trailer and the other noises and vibrations normally associated with the operation of a tractor-trailer of this sort, the Court is of the opinion that the driver cannot be held to have noticed any wobble of the wheel as it came off. This is especially true since there is no evidence concerning the severity of the wobble, its duration or whether it could have been discovered in time to avoid the accident.
For the above reasons, the Court is of the opinion that Bodcaw was not guilty of any negligence which contributed to this accident. Bodcaw's liability under the provisions *51 of Civil Code Article 2317 will be discussed hereinafter.

PULLMAN'S LIABILITY
Stated very simply, the wheel came off because the jam nut came off. The reason for the jam nut coming off will be more fully discussed in the portion of this opinion dealing with Fruehauf's liability. Plaintiffs Bodcaw and Fruehauf, argued that the design of what shall be referred to as the wheel retaining package was defective because it did not contain a positive locking device such as a spider washer or cotter key. Pullman admits that it manufactured the trailer in question in 1965 and that it is the legal manufacturer of the entire trailer, including the wheel retaining package in question, although it did not actually design the axle or the retaining package. The legal principles which must be applied in deciding this issue are discussed in Gauthier v. Sperry Rand, Inc. [La.App.], 252 So.2d 129 cert. denied [259 La. 940] 253 So.2d 382 (Third Cir. 1971) wherein the Court said:
"We agree that there were some dangerous features in the machine involved here, and that anyone who used it subjected himself to some risk of injury. But that is true of many other products, including automobiles, bicycles, farm implements, guns and even some kitchen appliances. The law does not require that the manufacturer make the product "fool proof" or "accident proof". As stated in Dean vs. General Motors Corporation, supra:
"The criterion by which liability is tested is "failure to exercise reasonable care in the adoption of a safe plan or design." The design must measure up to what the community is entitled to expect of those who persuade the public to buy their productssometimes, as in the case of GM, by dint of tremendous advertising campaigns. The standard "reasonable care" is deliberately flexible; it permits the trier of fact to exercise judgment in determining what measure of care is appropriate. But there is no "defect" in the design if reasonable care is taken in adopting it, even though the design is not perfect. For the plan need not be foolproof, nor sure against all contingencies. Whether there was reasonable care depends upon the facts known at the time it was adopted.'"
See also Leathem v. Moore, 265 So.2d 270 (La.App., 1st Cir., 1972) wherein the Court said:
"The ... rule requires the manufacturer to exercise reasonable care in the design of its products which are of such nature that, if not carefully made, can cause foreseeable injury to persons using the products for purposes which the manufacturer may reasonably expect they will be employed, and also to those whom the manufacturer may reasonably expect to be endangered by such probable use ...
"By its very nature, the criteria of reasonable care, applicable in instances of this nature, must be flexible inasmuch as it depends on the peculiar facts and circumstances of each case. Even though design may not be perfect or foolproof, it is still not defective provided reasonable care is taken in its adoption ..."
From the foregoing it is clear that Pullman owed a duty to use reasonable care in the adoption of the wheel retainer package design found on this trailer and that this standard of reasonable care is to be measured by the facts known at the time of the adoption and at the time of its use on this vehicle. It is also clear that Pullman is not charged with the obligation to produce a perfect, foolproof or accident proof design, nor one sure against all contingencies. It was conceded by most of the experts that the jam nut on the wheel in question was insufficiently tightened. It is claimed that if a spider washer or cotter key had been incorporated into the design that the wheel would not have come off despite the jam nut having been properly (sic) tightened. To counter this, Pullman admits that an improperly tightened jam nut would permit a wheel to come off and that a positive *52 locking device could prevent this. However, Pullman points out that even the spider washer or cotter key had its drawbacks as they are deformable, one-use items which would be replaced each time the wheel is taken off. Should one of these deformable positive locking devices by reused a portion of it could break off and fall into the bearings causing them to fail which could result in the wheel coming off.
Most of the experts agreed that the retaining package used here served the intended purpose extremely well if the person installing it properly tightened the jam nut in accordance with the manufacturer's specifications. The defect then, if there be one, is that an unqualified person might be called upon to install a wheel and in so doing fail to properly tighten the jam nut. However, this same person might reuse a spider washer or cotter key. In either case, there would be a danger that the wheel could come off. It seems clear then that the addition of the spider washer or cotter key would not remove the human element from the proper reassembly of the wheel. It should also be remembered that the basic design utilized in this retaining assembly is at least 62 years old. Engineering drawings reflecting the same three component parts, i.e., positioning nut, perforated lock washer and outer jam nut, dated 1914, were introduced by an employee of Rockwell International, the manufacturer of the axle and retaining assembly. Rockwell was in 1965 and is today the largest axle manufacturer in the world. A large percentage of the trucks operating on highways of this country are equipped with the retaining package used here. This has been true for many years. It is interesting to note that there is no evidence of any similar accident having occurred. Several Rockwell employees testified that they had never heard of such an accident. The prolonged marketing and use of this design and its general acceptance by the trucking industry for many years indicates its adequacy for the intended purpose.
The testimony of the various experts will not be recited herein. Careful consideration of that expert testimony along with the history of this retaining package and the major role that it has served in the trucking industry for many years, the lack of evidence of any similar accidents and the failure of the evidence to establish that the inclusion of a positive locking device such as cotter key or spider washer would lessen the chances of a wheel coming off, the Court feels that the evidence fails to establish that the design of this wheel retaining package was defective.
In view of the above findings, it is unnecessary to discuss the contentions that Fruehauf manufactured or re-manufactured the trailer and that this re-manufacturing is an intervening cause which relieves Pullman of any liability.

FRUEHAUF'S LIABILITY
As stated earlier, the jam nut came off and permitted the wheel in question to come off. One expert, Professor Barnwell, provided the opinion that the jam nut was loosened by a severe blow to the wheel at a particular angle. He stated that such a blow would loosen a properly tightened jam nut. Some of the other experts admitted the possibility that such a blow could loosen the nut but stated that it would probably damage other portions of the wheel or axle also. Most of the experts felt that the jam nut was not properly tightened the last time the wheel was installed. This would permit a much less severe blow or a period of normal road vibrations to loosen the nut. The Court accepts the latter explanation as it is supported by the bulk of expert testimony. It is also supported by the lay testimony of the Bodcaw employees and particularly that testimony concerning the low speeds at which the truck was operated on unimproved roads. It is also supported by the fact that none of the parts of the axle, wheel or wheel retaining package were damaged. Professor Barnwell's explanation is certainly possible, but it is not the most probable.
The truck in question has been in the exclusive control of Bodcaw since it was purchased from Fruehauf. Fruehauf admitted *53 removing the wheel and replacing it prior to the sale to Bodcaw. Bodcaw called most if not all of the people that had anything to do with the operation and maintenance of the trailer in question during its period of ownership and they all testified that they had no knowledge of the wheel ever having been removed since it was purchased from Fruehauf. Therefore, the Court must conclude that Fruehauf employees were the last persons to install the wheel.
Considering all of the above, it is the opinion of the Court that the sole proximate cause of this wheel coming off and the resulting accident is the negligence of Fruehauf's employees in failing to properly tighten the jam nut when they reinstalled the wheel.
In view of the above findings, it is clear that Bodcaw is not liable even though the doctrine of res ipsa loquitur is applicable."
The trial court determined that Bodcaw-Gulf were liable, in solido, to plaintiffs under R.C.C. Article 2317, citing in support thereof Loescher v. Parr, 324 So.2d 441 (La.1975). The trial court determined further, that since Bodcaw-Gulf were only vicariously liable they were entitled to indemnity over against Fruehauf-Continental. The trial court reasoned that although Bodcaw-Gulf clearly established that the defect in the wheel assembly was caused by the negligence of Fruehauf they were yet liable to plaintiffs since they were unable to exculpate themselves from responsibility by establishing that the fault of a third person and not the defect caused the accident. In other words, the trial court concluded that an owner-guardian of a defective thing can exculpate himself from liability only if the defective thing caused harm, not because of its defect, but rather because of the fault of some third person, the fault of the person injured or an irresistible force. Since the harm was caused by the defect the trial court concluded that Bodcaw-Gulf are liable under R.C.C. Article 2317.
We do not believe that the legal proposition espoused in Loescher v. Parr, supra, extends that far. In Loescher, supra, the majority clearly set forth the circumstances under which the owner-guardian of a defective thing which causes harm could escape liability, such circumstances being, page 447, "... if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force." In Loescher, Justice Tate was careful to point out that the defendant in failing to exculpate himself from liability failed to establish that, page 449, "... the fault ... of any third person contributed to (i.e., was a substantial factor in) the fall of the tree." In the instant case the defendants, Bodcaw-Gulf, established to the satisfaction of the trial court on the basis of substantial evidence that the tandem assembly was thrown from the Bodcaw van by reason of the negligence of Fruehauf's employees in failing to properly torque the jam nut. Under such finding, with which we agree, Bodcaw-Gulf are not responsible to plaintiffs under the provisions of R.C.C. Article 2317 having shown that, although owner-guardian of a defective thing, the damage was caused by the fault of a third person, i.e., Fruehauf Corporation. Accordingly, we will reverse that part of the trial court judgment which finds Bodcaw-Gulf liable in solido with Fruehauf-Continental to the plaintiffs and that portion of the judgment which grants Bodcaw-Gulf indemnity over against Fruehauf-Continental.
As previously set forth the trial court rendered judgment in favor of plaintiff, Anthony Panek, Jr., for the principal sum of $15,051.52 and in favor of Linda Bowen Panek for the principal sum of $80,000.00. Appellants have no complaint with regard to the amount awarded Mr. Panek but assert that the general damage award to Mrs. Panek is excessive. In fixing quantum in this case the trial court stated:

"QUANTUM
Anthony Panek, Jr., received generalized bodily contusions and abrasions, and a laceration of his chin. This scar is not seriously disfiguring. Mr. Panek's general *54 damages are set at $2,500.00. Linda Panek, age 27, received more serious injuries. In addition to generalized bodily contusions and abrasions she received serious injuries to her left leg which are enumerated as follows:
1. laceration of her anterior thigh;
2. comminuted (segmented) fracture of the left femur (femur broken into six separate pieces at this fracture approximately six inches below the thigh);
3. a simple non-displaced fracture of the femur at the femoral condyle;
4. fracture, non-comminuted, of the left tibia immediately below the knee;
5. compound comminuted fractures at the distal one-third of the tibia and fibula;
As a result of Mrs. Panek's injury she was confined under the care of Dr. Cayer of the Rapides General Hospital for a period of eleven days where her left leg was set in a cast. Thereafter, she was transferred to the East Jefferson General Hospital on August 12, 1974, where she was treated by Dr. Santo LoCoco, an orthopedist. She remained in East Jefferson General Hospital from August 12, 1974, through October 12, 1974. She was in traction during this period and her lower leg was in a cast and metal pins were surgically inserted into the fractured femur. She developed a vaginal infection in connection with her hospitalization and was generally in extreme pain and discomfort. On October 12, 1974, she was fitted with a spica cast which extended from the nipple area down her left leg to the ankle and down to the knee on the right leg. There was a bar connecting the right and left leg. She remained in this cast and confined to her home until November 25, 1974. On that date she was returned to East Jefferson Hospital where the cast was removed. Her left tibia had not healed properly and she was placed in a long leg cast extending from her hip to her foot. She received treatment until December 19, 1974. At that time she was discharged but still wore a leg brace. She was confined to a wheel chair for two or three weeks and to crutches through April 21, 1975. At that time she was able to discard one of the crutches but was required to use her crutch until June 21, 1975. She has a permanent scar on her left ankle and still suffers some swelling in her ankle and foot. She has a slight permanent limp and one-half inch shortening of the left leg. Dr. Banks testified that at the time of the trial she was suffering from a 65% restriction of motion in the left knee, restriction of motion in the left ankle and an overall 50% disability of the left leg. He felt that the disability of the left leg would improve to a 30% permanent disability or 12% of the body as a whole. Dr. LoCoco felt that there was a 50% permanent disability of the left leg. A clawing condition is developing in the left toes which will also create some problems for Mrs. Panek in the future. Mrs. Panek's previous life style and the limitation of activities which this accident has caused are fully explained in the record. It suffices to say here that she was extremely active and athletic prior to the accident and that many of her previous activities will now be restricted or prohibited. Considering the above, Mrs. Panek's general damages are set at $80,000.00. Her special damages amounted to $12,551.52."
The rule of appellate review as it applies to awards of general damages was rather recently set forth in the case of Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974) as follows:
"The appellate review of awards for general damages is limited to determining whether the trial court abused its great discretion. The adequacy or inadequacy of an award should be determined on the basis of the facts and circumstances peculiar to the case under review, having in regard also that the trier of fact has the advantage of seeing the witnesses and evaluating their testimony, including that of residual pain. The awards made in other cases provide no scale of uniformity; their use is limited to serving as an *55 aid to determine, if the present award is greatly disproportionate to similar awards (if truly similar), whether an issue of abuse of discretion may exist in the present case. In any event, an abuse of trial-court discretion must be clearly demonstrated by the record before an appellate court will tamper with an award of general damages."
We have considered the award made in this case in light of this well established rule and fail to find any abuse of the much discretion vested in the trier of fact. R.C.C. Article 1934; Bitoun v. Landry et al., 302 So.2d 278 (La.1974); McDonald v. Fidelity & Casualty Company of New York, 317 So.2d 267 (La.App.3rd Cir. 1975).
For the above and foregoing reasons we reverse that part of the trial court judgment in favor of plaintiffs and against Bodcaw Company and Gulf Insurance Company and that portion of the judgment which grants such defendants indemnity over against Fruehauf Corporation and Continental Casualty Company and now order that plaintiff's demands against Bodcaw Company and Gulf Insurance Company be dismissed with prejudice. It is further ordered that the third party demand of Bodcaw Company and Gulf Insurance Company against Fruehauf Corporation and Continental Casualty Company be dismissed with prejudice. We further amend the trial court judgment so as to cast Fruehauf Corporation and Continental Casualty Company for all costs of these proceedings both in the trial court and on appeal. In all other respects the judgment appealed from is affirmed.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.