343 So.2d 1153 (1977)
TIGER WELL SERVICE, INC., Plaintiff-Appellee,
v.
KIMBALL PRODUCTION COMPANY, Defendant-Appellant.
No. 5820.
Court of Appeal of Louisiana, Third Circuit.
March 4, 1977.
*1154 Scofield, Bergstedt & Gerard, Lake Charles (Benjamin W. Mount, Lake Charles, of counsel), for plaintiff-appellee.
Woodley, Fenet & Ranier, Drew A. Ranier, Lake Charles, for defendant-appellant.
Before CULPEPPER, GUIDRY and FORET, JJ.
GUIDRY, Judge.
This is a suit on open account wherein plaintiff, an oilfield workover rig service company hereinafter referred to as "Tiger", seeks to recover the amount of services and materials furnished by it to Kimball Production Company, hereafter referred to as "Kimball", under an oral contract whereby Tiger was to workover an oil well owned by Kimball in Calcasieu Parish. Kimball denied any indebtedness to Tiger and by way of answer and reconventional demand asserts that as a result of Tiger's negligent, unworkmanlike performance and use of faulty and improper materials in the performance of such contract, Kimball sustained damage in the amount of $7871.86 for which they should be granted judgment.
This matter was consolidated with two other suits for trial, one a jury case and the other a non-jury case. We are this day rendering separate decrees in each of these cases, i. e., Trahan v. Highlands Insurance Company et al., 343 So.2d 1163 (La.App. 3rd Cir. 1977) and Tiger Well Service Inc. v. Travelers Insurance Company et al., 343 So.2d 1158 (La.App. 3rd Cir. 1977).
The facts essential to a resolution of the issues presented in each of these cases are common and were succinctly, clearly and accurately set forth by the trial judge in his reasons for judgment. We take the liberty of quoting from the trial judge's reasons for an accurate account of the facts which give rise to the claims set forth in the three cases and in order to set forth the trial court's conclusions and resolution of the issues presented. The trial court stated:
"These are three consolidated suits arising out of an industrial accident wherein a production rig overturned, causing a death of the derrick man and property damage and other losses.
The Trahan case was an action by the surviving widow and a minor child for the death of the husband and father against Arthur Tidwell, an executive officer of Tiger Well Service, and his insurer, Highlands Insurance Company; Travelers Insurance Company, as the insurer of Carl McClelland, an alleged executive officer of Tiger Well Service; Permian Engineering and Manufacturing Company, Inc., and its insurer, Travelers Insurance Company; and Fred E. Cooper, Inc.
The Trahan case was a jury case which was tried and interrogatories were answered by the jury. Arthur Tidwell and his insurer, Highlands Insurance Company and Permian Engineering & Manufacturing Company, Inc., along with its insurer, Travelers Insurance Company, were found negligent, which negligence was a proximate cause of the accident causing the death of Norman Trahan, the husband of the plaintiff, Joan Trahan, and father of Belinda, the minor. The jury also found that the equipment manufactured by Permian was defective and such defect was a proximate cause of the accident. The evidence in that suit was introduced for the purpose of deciding the remaining two cases which are non jury and will be decided by the court.
The evidence presented to the jury reflects that Tiger Well Service, Inc. is essentially operated by one person, Arthur Tidwell. Tidwell testified that in 1971 he attended an oil show in Lafayette, Louisiana where he had an opportunity to look at the production rig on exhibit by Fred E. Cooper, Inc. As a result of the inspection of the rig, Tidwell decided to purchase the rig from Cooper. He specified that the mast or derrick must be a Pemco derrick manufactured by Permian Manufacturing & Engineering Company, Inc. The rig was later delivered to Tiger Well Service, Inc. and it was put into operation upon receipt of same. When we say "rig" in this opinion, we are referring to a production unit which is a portable unit; that is, one which is mounted upon and can be transported on a *1155 large conveyance, which forms a part of the unit itself. This rig is designed and used as a production unit and not a drilling rig. It does not handle the heavy pipe and working operations that a drilling rig handles and is not designed for such. It is a smaller unit and performs lighter work operations than does a drilling rig. This rig was used continuously up until 1973. During the year 1973 the rig was on location and during the night, when no one was around, due to weather conditions, the derrick being in an upright position and having pipe in same, was blown over. This accident caused damage to the derrick and its appurtenances and specially the racking board. The racking board is a device which is located approximately 50 feet from the ground and its principal purpose is to afford a place for the derrick man to work and to place the pipe as it is removed from the hold (sic) into the rack in rows.
After the 1973 fall, the derrick was removed from the site and returned to Permian Engineering & Manufacturing Company, Inc. for repairs. A 5 foot section of the 3½ inch square tubular material was removed from the racking board and replaced due to damage. Other portions of the racking board were straightened and after further repairs were completed the derrick was returned to Tiger Well Service, Inc. for further operation.
The equipment was put back into service and on January 3, 1975, pipe was being removed from a well owned by Kimball Production Company. Carl McClelland was the driller and the deceased, Norman Trahan, was the derrick man. Two other men worked on the floor with the driller. As the pipe is removed, it is done so two joints at a time, which is approximately 60 feet of pipe and these are called "stands". As the "stands" are unscrewed and the (sic) set on the platform below, the derrick man opens the elevators that have brought the pipe up and places the top portion of the "stand" between fingers in the racking board. The procedure for racking this pipe, as it is removed, is to place one row on the derrick man's right and then the next row will be to his left. He will alternate the rows as they accumulate for the purpose of equalizing the forces that the pipe exerts against the derrick.
On the day in question the derrick contained approximately 10,000 feet, or 90,000 pounds of pipe. Suddenly, after Trahan had removed the elevators from a "stand", the driller testified that he heard a noise and looked up and saw the racking board swinging around to the west, or to the derrick man's left. As the racking board swung around the weight of the pipe, on the derrick man's right (east side), shifted, causing the derrick to fall. When the derrick fell Trahan was in between the two stacks of pipe, which stacks weighed approximately 45,000 pounds each. He was killed instantly upon impact.
The expert testimony along with that of the drilling crew that were present on the rig at the time of the accident, was to the effect that the cause of the accident was that the main tubular steel frame of the racking board broke at the southeast corner, which explained the fact that the racking board swung around to the west, causing the pipe to shift, which in turn overturned the derrick.
Extensive testimony was produced pertaining to the method of installing guylines and anchors for the purpose of stabilizing the derrick while it was up and in operation. The substance of the testimony reveals that Permian Engineering & Manufacturing Co., Inc. published an instruction manual with a drawing reflecting that the derrick should have been equipped with four guylines from the crown, or the top of the derrick, out to four anchors. The derrick should further be equipped with two guylines, which extending from both corners of the racking board, crossing each other, and tied to two of the mast anchors. This would give the derrick six guylines with four anchors. The drawing that was sent to Mr. Tidwell was included in a large information book, compiled by and sent by Fred E. Cooper, Inc., to Tidwell for the operation of the rig. The instructions did not set out the number of anchors, but a review of the diagram reflects *1156 the six guyline setup. Tidwell testified that he installed two guylines from the crown and two from the racking board.
After the rig fell in 1973 and was repaired, Tidwell did not change this anchor setup. He continued to use the two guylines from the mast and two from the racking board. It is important to note that these guylines are labeled "wind lines". The principal purpose of the guyline is to stabilize the rig in weather conditions and to keep down any swaying while it is in operation. They are not of the strength or the character that would hold a derrick upright when there is a sudden shift of pipe that is standing in the derrick, which shift would cause forces to be exerted beyond the capacity of these guylines.
The jury found Arthur Tidwell negligent, which negligence was a proximate cause of the accident. There is ample evidence upon which the jury could have concluded this. The expert testimony of Mr. Weaver, was that the existence of a proper anchor system would have delayed the toppling of the derrick for a matter of seconds. It was further shown that in a matter of seconds the derrick man could have removed his belt and possibly used a "geranamo" (sic) line for escape, if it had been available to him. No "geranamo" (sic) line was placed upon this derrick. The jury could have concluded that this lack of a "geranamo" (sic) line and the lack of proper anchoring was negligence, which was a proximate cause of the death of Norman Trahan.[1] But, as to the fall of the derrick, the evidence clearly reflects that once the racking board broke, and the pipe shifted its weight, there is no guyline arrangement, including the one recommended that would keep the derrick upright. These extreme forces would have brought the derrick down, guylines or no guylines. The reason I am bringing this out is because, even though Arthur Tidwell may have been negligent in not having the derrick properly "guyed", the lack of proper guylines was not a proximate cause of the derrick falling. It could have been a proximate cause of the death of the man when coupled with the lack of a "geranamo" (sic) line. Having come to this conclusion, then I conclude that any negligence of Arthur Tidwell was not a proximate cause of the accident. Tiger Well Service, Inc. would not be liable for the property damages incurred as a result of the fall.
As to Permian, the evidence reflects that the steel at the point of the break was defective. Mr. Weaver, a qualified expert in the metalurgy field, stated that his test revealed that the temperature of the weather, approximately 49 degrees, was such that the s teel (sic) at this point became brittle and actually broke. Permian presented an expert who did not run any test, but merely by observation, felt that the steel was not brittle, but was broke (sic) for some other reason. This court accepts the testimony of Mr. Weaver that the steel was defective at this point and broke. The break in the racking board was the beginning of a chain reaction, which brought the derrick down. The fall of the derrick was proximately caused by the negligence of Permian Engineering & Manufacturing Company, Inc.
It is on this basis that we will decide the two non-jury cases.
Tiger Well Service, Inc., in No. 108,471, sued Kimball Production Company for $5,935.79 as the amount due Tiger Well for services due up to the time of the fall of the derrick. Kimball reconvened for damages on the basis that Tiger Well Service, Inc. "negligently performed the contract with Kimball Production Company." The sum for services was stipulated as being $5,935.79.
Having concluded that Tiger Well Service, Inc. was not negligent, or, if so, such negligence was not a proximate cause of any property loss, the reconventional demand of Kimball Production will be dismissed and judgment in the amount of $5,935.79 shall be awarded in favor of Tiger Well Service *1157 and against Kimball Production Company. Kimball is to pay costs in # 108,471."
Kimball appealed from the trial court judgment and asserts that the trial judge erred in failing to find that Tiger was liable, as a matter of law, to Kimball on the basis of the contractual relationship between the parties. Appellant does not seriously question the trial court's finding of Tiger's delictual non-liability[2] but asserts that the trial court erred in failing to award damages on the basis of breach of contract and specifically cites in support of its contention R.C.C. Articles 1930 and 2769.
The substantial issue for determination on this appeal is whether one who undertakes the performance of a contract for services and employs the use of defective equipment which causes harm to other property of the obligee but which does not otherwise affect his workmanlike performance of the contract is responsible in contract for the damage caused when it is established that the defect in the equipment was caused solely by the fault of a manufacturer, third party.
At the outset we observe that the amounts sued for by Tiger and Kimball are not in dispute. Tiger and Kimball stipulated that the amount due Tiger was $5935.79. Kimball does not appeal the trial court's award to Tiger. The property damage sustained by Kimball when the rig collapsed was stipulated to be the sum of $7871.86.
The articles of our civil code relied upon by Kimball to support its contention provide as follows:
R.C.C. Article 1930:
"The obligations of contract [contracts] extending to whatsoever is incident to such contracts, the party who violates them, is liable, as one of the incidents of his obligations, to the payment of the damages, which the other party has sustained by his default."
R.C.C. Article 2769:
"If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."
It is generally held that under the cited articles every contract for work or services carries an implied obligation on the part of the contractor that he will perform in a good workmanlike manner in default of which he must respond in damages for the losses that may ensue. In Hebert v. Pierrotti, 205 So.2d 888 (La.App. 3rd Cir. 1968) we stated:
"As a general rule, there is implied in every contract for work or services that the work will be performed in a skillful, careful, diligent and good workmanlike manner. LSA-C.C. arts. 1930 and 2769; Wolfe v. LeVasseur-Hinson Construction Company, 147 So.2d 747 (La.App. 2d Cir. 1962); Hunter v. Mayfield, 106 So.2d 330 (La.App. 2d Cir. 1958); Rotolo v. Stewart, 127 So.2d 24 (La.App. 1st Cir. 1961); Rathe v. Maher, 184 So.2d 256 (La.App. 1st Cir. 1966); 17A C.J.S. Contracts § 329, p. 292; 17 Am.Jur.2d, Contracts Sec. 371, p. 814."
We acknowledge the force of this legal principle, however, the many cases in which this principle was applied indicates that before the contractor can be cast in damages for breach of this implied obligation it must be established that the damages *1158 suffered by the obligee arose as a result of faulty workmanship or from the use of defective materials or equipment which the undertaker knew or should have known were defective. In Hebert v. Pierrotti, supra, the house moving contractor was found liable upon proof that the house was damaged because he failed to exercise proper care in blocking or filling a ditch so that the truck and trailer could keep the house level while it was being moved. In Hunter v. Mayfield, 106 So.2d 330 (La.App. 2nd Cir. 1958) which involved damages caused as a result of defective plumbing, the court found the plumbing sub-contractor responsible because of defective materials, poor workmanship and inadequate inspections. In Rathe v. Maher, 184 So.2d 256 (La.App. 1st Cir. 1966), writ refused May 19, 1966, the contractor was held responsible in damages upon a showing that sagging floors, etc. were caused by poor workmanship.
In such cases it is essential for recovery that plaintiff establish that the damages were the result of poor workmanship or from the use of materials which the undertaker knew or should have known were defective. In short a contractor is liable under the cited articles only upon proof that the contract was not performed in a workmanlike manner. This proof necessarily includes some showing of want of skill, efficiency or knowledge, or some lack of ordinary care in the performance of the work or in the selection of suitable materials and equipment. There is no liability as a matter of law or strict liability under the cited articles as contended by appellant.
We have carefully considered the record in light of our understanding of the legal principle involved and determine that the trial court correctly rejected Kimball's demand in contract. There is no evidence whatever which would indicate that Tiger failed to perform its contract with ordinary skill and care. Quite to the contrary the record reflects that Tiger did everything that a skilled workover operator would have done. Kimball does not dispute this and in fact readily admits its obligation to pay Tiger for the services rendered by the latter in the workover operation up to the time of the rig collapse. There is likewise no evidence in the record which would even suggest that Tiger knew or had any reason to suspect that a defect existed in the racking board on this rig. Tiger clearly did not violate any duty of skill or care under its contract with Kimball by using the workover rig in question which unknown to Tiger contained a hidden defect.
As aforestated, in an action such as this, plaintiff bears the burden of establishing by a preponderance of the evidence that the damages suffered were occasioned by reason of unworkmanlike performance of the contract. In this case plaintiff has failed to carry that burden.
For the above and foregoing reasons the judgment of the trial court is affirmed, appellant to pay all costs of this appeal.
AFFIRMED
NOTES
[1] The proper name of this safety device is "geronimo" line.
[2] Kimball does not discuss and the trial judge did not consider the effect of R.C.C. Article 2317 and the decision of our Supreme Court in Loescher v. Parr, 324 So.2d 441 (La.1975) in regard to the delictual responsibility of Tiger. However, in our recent decision in Panek v. Gulf Insurance Company, 341 So.2d 46 (La. App. 3rd Cir. 1976) we held that the ownerguardian of a defective thing which causes harm could exculpate itself from responsibility upon establishing that the defect and resultant harm was caused by the fault of a third person. In this case, although Tiger was owner-guardian of a defective thing which caused harm, Tiger is relieved of responsibility under R.C.C. Article 2317 having established that the collapse of the rig and resultant damage suffered by Kimball was caused solely by the fault of Permian Engineering and Manufacturing Company, Inc. See Panek v. Gulf Insurance Company, supra.