748 So.2d 42 (1999)
Paul Rodney WILLIAMS et ux., Plaintiffs-Appellants,
v.
Eddie ALFRED, Defendant-Appellee.
No. 99-743.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1999.
*43 Randall Hart, Lake Charles, for Paul Rodney Williams, et ux.
James Edward Burks, Lake Charles, for Eddie Alfred.
Before YELVERTON, SAUNDERS, and GREMILLION, Judges.
GREMILLION, Judge.
The plaintiffs, Paul and Karen Williams, appeal the judgment of the trial court finding the defendant, Eddie Alfred, fifty percent at fault for defective masonry work and awarding them damages as a result of the breach of his implied warranty of good workmanship. For the following reasons, we set aside the judgment of the trial court and render judgment in favor of the Williams awarding them damages.

FACTS
The Williams hired Alfred, a mason, to brick their new home in Carlyss, Louisiana in 1995. The parties agreed that Alfred would provide the labor in exchange for $5,750.00, while the Williams would provide all of the materials necessary to complete the job. The Williams purchased all of the materials, except the masonry sand (sand), from Herman Brown Brick Company, Inc. (HBBC). Ray Johnson, a sales representative of HBBC estimated the amount of bricks, sand, and masonry cement (cement) required for the job. This included 110 bags of cement, 12.2 cubic yards of sand, and 14,610 bricks. HBBC delivered the first load of bricks and 110 bags of cement to the work site on Friday, August 4, 1995. Alfred began work the following Monday, August 7, 1995, and finished the job approximately three weeks later.
Alfred used seventy-seven bags of cement to complete the job. Of the thirty-three bags remaining, the Williams returned twenty-seven to HBBC for credit and kept six for their personal use. When the Williams returned the unused cement to HBBC, Johnson told them, "You've got a problem." He told them that if they used all of the brick, they should have used all of the cement. A total of 15,090 bricks were delivered by HBBC. Paul estimated that approximately 400 bricks remained after Alfred finished bricking the house. One cubic yard of sand remained out of the fourteen cubic yards delivered.
A couple of weeks later the Williams began noticing cracks in the mortar located in the outer walls and the fireplace. They reported the problem to both Johnson and Alfred. When Johnson inspected the house, he noted that the mortar was white and he was able to dig the blade of his pocket knife into the mortar, indicating an insufficient amount of cement in the mortar. Alfred attempted to repair the cracks on three different occasions. However, when the Williams asked him to tear down and redo all of the brick work, Alfred refused to do any more work on the house.
*44 The Williams filed suit against Alfred seeking damages for the breach of his implied warranty of good workmanship. Alfred answered denying such a breach. Following a trial on the merits, the trial court issued oral reasons finding Alfred fifty percent at fault for failing to add sufficient cement to the mortar mix, and allocating the remaining fault to defective cement. Disregarding the estimates submitted by the Williams, the trial court held that it should only cost $8,000.00 to tear down and rebrick the whole house. However, it estimated that the Williams should only have to tear down 25% of the remaining brickwork, and awarded them $2,000.00, or 25% of $8.000.00. The trial court further awarded the Williams $3,976.00 for the amount expended in tearing down and hiring another mason to redo the fireplace. Accordingly, the trial court awarded $6,000.00 to the Williams, reduced by 50% for the defective mortar, for a total of $3,000.00. This appeal followed.

ISSUES
On appeal, the Williams raise two assignments of error. They argue that the trial court erred by not finding Alfred one hundred percent liable for their damages, and that it erred in awarding them only $6,000.00 in damages.

MANIFEST ERROR
Initially, we note that a thorough review of the record leads us to a finding that the trial court, through its actions, committed manifest error. As pointed out by the Williams, the trial court visited their home prior to rendering judgment, during which it conducted tests on the mortar with a metal probe. In rendering its decision, the trial court based its findings, in large part, on what it observed and learned during that visit. In its oral reasons, the trial court stated:
I went out to the site and I brought a piece of metal probe and I tried to chip out mortar around the house, and for the most part I was not able to do so. Most of it was just as hard and as solid as I've ever seen a brick job done. However, there were some areas that was soft and wasthere was some cracking. I was not that excited about the cracking except it seemed to be a little more that I would expect. I did take into consideration the fact that Mr. Williams lives on Highway 27 not very far from the road, probably about a hundred yards from the road, and it's a heavily traveled road with a lot of heavy trucks going down that road. It might have some effect, why we had the cracking, but I do believe part of the problem is because there wasn't enough mortar in the sand. But I'm not convinced that was the only problem.
. . . .
... And I also note that the columns I looked at, I didn't see any problems with any of the columns. I mean, I really banged, chiseled away at the columns without any effect.
. . . .
So, I just estimated as probably about from the walk around the house, probably about 25% worth of damage to the outside wall of the house, and I came up with a figure of $8,000, 25% of $8,000 is $2,000 added to the amount of damage thatmoney Mr. Williams already expended to the fireplace area ... I can't rely upon one piece of materialone sample taken off of an area that is obvious that something's wrong with the masonry and maybe the mix to be representative of the problem throughout the outside of the house and/or chimney because of what I discovered for myself and because what the video showed, as already indicated.
... because I believe this problem will be corrected far shorter what it's going to cost to tear the whole house down, and my thinking is, there was about three or four areas of defect that I noticed of less than three to four square feet in area, and I think this can be *45 corrected pretty easily, and it shouldn't take much more than $1500 to do it.... and I'm just not convinced of that from the evidence and from what I witnessed and viewed for myself when I went out there.
A trial court is usually not permitted to visit an accident site, or in this instance, a work site, to perform tests, take measurements, or make visual observations, and then rely on its findings in deciding the matter at issue. Moncla v. Albertson's Inc., 95-1139 (La.App. 3 Cir. 1/31/96); 670 So.2d 316, writ denied, 96-0555 (La.4/19/96); 671 So.2d 921.
Disputed facts are not in the same vein as the laws of nature, geographic and historical facts, time, laws and other matters of common knowledge. The resolution of disputed issues of material fact by judicial notice is improper. Pierce v. Board of Supervisors of Louisiana State University, 392 So.2d 460 (La.App. 1st Cir.1979). Further, absolutely no foundation was laid for this evidence. The proper foundation for admitting results of experiments of this type is to show that the tests were conducted under conditions similar to those prevailing at the time of the accident. Guidry v. Boston Old Colony Insurance Company, 540 So.2d 543 (La.App. 3d Cir.1989), writ denied, 543 So.2d 7 (La. 1989). Expert tests based upon assumptions not proven or upon variable factors not established are of no value. Baham v. Patterson, 353 So.2d 366 (La. App. 1st Cir.1977). Judicial notice is a substitute for and an equivalent of evidence and facts should not be noticed unless otherwise admissible. Dimm v. Granier, 284 So.2d 850 (La.App. 4th Cir. 1973).
Elliott v. U.S. Fidelity & Guar. Co., 568 So.2d 155, 158 (La.App. 2 Cir.1990).
The trial court's role is to receive and weigh evidence, not to gather and present evidence. Certainly, the trial court is not a qualified expert in mortar and brick construction, and the results of any experiments conducted by it are of no value. Since the factual insight purportedly gained through its observations and calculations are not the type of facts of which judicial notice may be taken, the trial court committed error. Elliott, 568 So.2d 155. The trial court effectively removed its cloak of impartiality and placed itself in the witness stand although not subject to cross-examination or its findings subject to verification. Accordingly, we will undertake a de novo review of the entire record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d 840 (La.1989).

LAW
Article 2769 of the Louisiana Civil Code provides that an undertaker, who "fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract." In Brown v. Smith, 527 So.2d 606, 609 (La.App. 3 Cir.), writ denied, 532 So.2d 117 (La.1988), quoting Hebert v. McDaniel, 479 So.2d 1029, 1033 (La.App. 3 Cir.1985), this court stated,
This article dictates that every contract for work or services contains an implied obligation of performance in a good workmanlike manner in default of which the contractor must respond in damages for any losses which may ensue. Tiger Well Service, Inc. v. Kimball Production Co., 343 So.2d 1153 (La.App. 3 Cir.1977).
The plaintiffs burden of proof in such a case is to prove that a defect exists and that the defect came about as a result of faulty workmanship or materials. Neel v. O'Quinn, [313 So.2d 286 (La.App. 3 Cir.1975)], supra; Melder v. Cassiott[Gassiott], [436 So.2d 628 (La. App. 3 Cir.1983)], supra; Tiger Well Service, Inc. v. Kimball Production Co., supra; Bico Enterprises, Inc. v. Cantrell, 413 So.2d 260 (La.App. 3 Cir.1982).
*46 The plaintiffs must prove their case by a preponderance of the evidence. Melder v. Gassiott, 436 So.2d 628 (La.App. 3 Cir. 1983).
Johnson testified that his duties for HBBC include estimating the amount of brick, cement, and sand needed for masonry jobs. He stated that he has estimated approximately 9,000 jobs over the eight years he has worked for HBBC, in the area of twenty to twenty-five a week. Johnson testified that cement is the glue that bonds the mortar mix; explaining that it coats each particle of sand causing them to bond together. He stated that an insufficient amount of cement in the mortar will lead to rapid deterioration, water leakage, and excessive cracking, and if there is a freeze and thaw, the mortar will absorb larger amounts of water and deteriorate much faster.
With regard to the matter at issue, Johnson testified that the Williams used Holnam Type N C270 cement for their job. He stated that the mixing instructions on the cement bag state that three cubic feet of sand should be mixed with each bag of cement, for a ratio of 3:1. The instructions indicate that three-quarters of the required water and one-half of the sand should be mixed with the bag of cement in the mixer, and then the remaining sand and water should be added to reach the desired consistency. The mortar mixture should then be mixed between three to five minutes. Johnson testified that of the 110 bags of cement sold to the Williams, twenty-seven were returned for credit. At that point, Johnson stated that he told the Williams, "You've got a problem." He explained that they should have used all of the cement if all of the bricks delivered were used.
Johnson testified that the Williams contacted him approximately two weeks later complaining that their bricks were breaking. When he inspected the brick work, Johnson noted that the mortar was white looking, and that he was able to dig the blade of his pocket knife into the mortar. Both of these things indicated that the mortar contained too much sand. Johnson testified that he would not have been able to dig into the mortar if it contained the proper amount of cement. He testified that he sent samples of the mortar to the Holnam laboratory for analysis. He further stated that the only way to correct defective mortar is to tear it down and redo it.
Paul testified that HBBC delivered 110 bags of cement to his house on Friday, August 4, 1995. He stated that the bags were set down on pallets, wrapped in plastic, and banded down with metal bands. None of the bags were laid on the ground. He stated that fourteen cubic yards of sand were delivered and placed on plastic located on the ground, and then covered with more plastic. Paul testified that Alfred started work the next Monday, August 7, 1995.
Paul testified that thirty-three bags of cement remained after Alfred finished bricking the house. Of these, twenty-seven were returned to HBBC for credit and the remaining six bags were retained by him. Additionally, one cubic yard of sand and approximately 400 bricks were unused. Paul said that he began noticing problems with the masonry work after Alfred finished the job. He stated that the bricks under the windows were cracking and washing out, and that mortar was coming out from the location of the eave vents. He stated that around the fireplace, one of the walls was completely loose. Paul testified that the cracks in the mortar did not extend down into the cement slab, rather they stopped at the bottom of the brick wall. When he reported the problem to Alfred, Paul stated that Alfred attempted to patch the cracks on three different occasions by placing more mortar over the cracks. He stated that the cement used by Alfred for these repairs came from one of the six bags left over from the job. Paul stated that this mortar was darker in color from the original mortar mixed by Alfred. He further *47 said that this mortar would not stick to the original mortar and started flaking off. Paul testified that the samples sent to the Holnam laboratory were obtained from the fireplace and underneath the doors and windows.
James Payte, a mason, inspected the Williams' home and gave them an estimate for redoing the brick work. He testified that the mortar in the fireplace was cracking and the bricks were easily removed by hand as a result of too much sand in the mortar. Payte told the Williams that the fireplace presented a fire hazard and should be torn down and redone. He estimated that it would cost $3,500.00 to tear down and redo the fireplace, and $9,000.00 to tear down and rebrick the outside of the house. Payte eventually rebuilt the fireplace for $3,100.00, since the Williams tore it down and cleaned the bricks themselves. Payte testified that the only way to correct defective mortar is to tear the brick work down and redo it.
Randall Owens, a real estate broker, inspected the Williams' home for marketability. He stated that there was excessive cracking in the mortar, which was coming apart all around the house, and that the home compared poorly with other brick veneer homes. If the home was put on the market, Owens testified that the Williams would have to disclose any problems with or any known adverse surveys or reports on the house, such as Holnam laboratory's masonry report. If the home were put under contract to be sold, Owens testified that an appraiser would require an inspection by an engineer due to the excessive cracking in the mortar. Moreover, he stated that mortgage companies will not loan money on a home unless it has a clear engineer's inspection. In order to obtain a clear inspection, he stated that all of the cracks in the mortar would have to be repaired or replaced.
Leo Michael Meyers, the supervisor of the Petrographic Laboratory for Holnam, specializes in concrete and chemical add mixtures. He testified that he obtained samples of mortar, sand, Type N cement taken from the Williams home from Gregg Gaines, Holnam's market manager for the Texas Gulf Region. Meyers testified that the mortar samples could be crumbled fairly easily indicating that it was not as strong as expected. Tests revealed the ratio of sand to cement in the samples was 4.5:1. He stated the ratio should have been 2.25:1 at the minimum, or 3:1 at the maximum range if the cement had been mixed according to the manufacturer's instructions. He testified that the strength of mortar declines as the amount of sand increases with respect to the amount of cement present.
Meyers testified that the comprehensive strength of mortar mixed at a ratio 4.5:1 from sand and cement obtained from the Williams was 660 psi or pounds per square inch. He stated that Type N cement, when prepared under appropriate laboratory conditions should produce a minimum strength of 750 psi after setting up for twenty-eight days as stated by the American Society for Testing and Materials (ASTM). Meyers testified that mortar made from the same materials and mixed according to manufacturer's instructions exceeded the minimum 750 psi when mixed in both the maximum and minimum ranges. The twenty-eight day strength of type N mortar mixed at a ratio of 2.25:1 was 1,670 psi, and the ratio of 3:1 was 930 psi. Alfred testified that the mortar for the Williams' home was mixed by his son and another employee. He testified that three cubic feet of sand equals twenty-four shovels of sand, and that one cubic foot equals eight shovels of sand. He stated that it was his custom to mix mortar in a ratio of sixteen shovels of sand to one cubic foot of cement, although the manufacturer's instructions recommended 3:1. He testified that it took seven bags of cement to lay 1,000 bricks, thus, 11,000 bricks would require seventy-seven bags of masonry cement.
Alfred recalled that some of the bags of cement were stacked on pallets and some *48 were stacked on the ground after being delivered by HBBC. He further stated that approximately ten to fifteen bags were thrown out because they were bad, and that Paul was informed of this. He testified that he did not use any bad cement on the job, but qualified his testimony by stating that he could not determine the mortar's strength simply by looking at it.
Alfred testified that he was contacted by the Williams about cracks developing in the mortar two weeks after completing the job. He said he attempted to patch the cracks on three different occasions, but refused to tear down all of the bricks at the Williams' request. Alfred testified that he believed bad cement, and not too much sand, was the cause of the defective mortar.
With regard to Meyers's testimony that the mortar samples were composed of a ratio of 4.5:1 parts sand to cement, Alfred testified that 4.5 cubic feet of sand would equal thirty-six shovels of sand. He stated that his mixer would have been unable to turn if thirty-six shovels of sand had been mixed with one bag of cement. Alfred felt that he would have known if the mortar was too sandy because he would have been unable to lay it on the wall with his trowel, it would not have stuck to the bricks, and the bricks would have sucked the water out of the mortar. If he had used too much cement, then the mortar would have been gummy and would have stuck to his trowel.
Alfred testified that mortar left on the ground becomes damp and lumpy. He further stated that cement which is held a long time by either the manufacturer or seller can become "dead." Although dead mortar will still hold, it is not like fresh mortar. He further stated that he is unable to tell if mortar is dead by looking at it.
After considering the testimony and all of the evidence, including the videos and photographs, we find that the Williams have proven by a preponderance of the evidence that a defect existed in the mortar, and that the defect arose as a result of Alfred's failure to mix sufficient cement with the sand. One hundred and ten bags of cement were delivered to the work site by HBBC. Of these, seventy-seven were used, twenty-seven were returned for credit, and six were retained by the Williams. However, if we believe Alfred's testimony that ten or fifteen bags of cement were thrown out, then only sixty-two to sixty-six bags were used by him to complete the job.
The instructions for the cement state that one bag of the cement should be mixed with three cubic feet (by volume) of sand. One bag of cement equals one cubic foot. Alfred testified that twenty-four shovels of sand equals three cubic feet, but that he customarily mixed sixteen shovels of sand with each bag of cement in a ratio of 2:1. Mixing the mortar in this fashion would have resulted in 154 cubic feet of sand per seventy-seven bags of cement. Converting 154 cubic feet to cubic yards equals 5.7 cubic yards of sand used.[1] Paul testified that of the fourteen cubic yards of sand delivered, thirteen cubic yards were used by Alfred. Thus, according to Alfred's own calculations, he added too much sand to the cement while mixing the mortar. Thirteen cubic yards of sand converts to 351 cubic feet. If 351 cubic feet of sand is used per seventy-seven bags of cement, this equals a ratio of 4.56:1, exceeding Holnam's recommended 3:1 ratio. Moreover, the 4.56:1 ratio parallels the laboratory results testified to by Meyers, which determined that the mortar samples from the Williams' home were composed of 4.5:1 parts sand to cement.
*49 Alfred opined that the weakened mortar was caused by defective cement, buttressing his argument with testimony that some of the cement was stored on the ground after delivery and by relating that ten to fifteen bags of cement were thrown out. However, we find no merit in this argument in view of the overwhelming evidence supporting the finding that too much sand was mixed into the mortar, and Alfred's own testimony that all of the bad cement was thrown out.
Considering all of the evidence, we find that the Williams have proven that the mortar used on their home was defective, and that it resulted from Alfred's failure to mix the mortar in a workmanlike manner. The judgment of the trial court is reversed and set aside, and judgment is rendered in favor of the Williams finding that Alfred breached his implied warranty of good workmanship.

DAMAGES
Damages for the breach of an implied warranty of good workmanship are generally the cost of repairing the defects. La.Civ.Code art. 2769. However, when repair is impossible, the proper remedy is replacement. Wilkinson v. Landreneau, 525 So.2d 617 (La.App. 3 Cir.1988); National Tea Co. v. Plymouth Rubber Co., 95-254 (La.App. 5 Cir. 10/18/95); 663 So.2d 801.
The evidence supports a finding that total replacement of the brick work is appropriate. Johnson and Payte both testified that defective mortar can only be repaired by being torn down and redone. Payte testified that the fireplace presented a fire hazard, and as a result, the Williams had it torn down and rebuilt. A video showed Paul remove bricks from the fireplace and crumbling the mortar with his hands. Another video showed him removing bricks from the outer wall of the house. The video and photographs also revealed extensive cracking and washing out of the mortar under doors, windows, and throughout the house. Owens testified that there was excessive cracking in the mortar, and that it was coming apart all around the home.
Paul testified that Payte estimated it would cost $12,500.00 to tear down and redo all of the brickwork, including the fireplace. This estimate was for labor only, and included cleaning the old mortar off of the bricks. Payte broke the charges down to $3,500.00 for the fireplace and $9,000.00 for the rest of the house. He eventually rebuilt the fireplace for $3,100.00. The Williams listed their total damages for the fireplace at $4,296.83, including out-of-pocket expenses spent on additional cement; sand; replacement fill bricks, plywood, boards, and screws purchased to protect the metal roof; Payte's labor, and an additional $320.00 for their labor in tearing it down.
Paul obtained two other estimates for redoing the remainder of the brickwork. Al Mouton estimated that it would cost $2,500.00 each to tear down and clean the bricks, and $6,187.00 for labor, for a total of $11,187.00. Jay Berkley gave the Williams an estimate of $9,400.00, including $3,600.00 for labor, $4,800.00 for demolishing and cleaning the brick, and $1,000.00 for rebuilding the columns. Paul testified that they are seeking $10,500.00 in damages for the cost of redoing the remaining brickwork, which includes purchasing additional cement, sand, additional bricks, and labor.
Considering the evidence, judgment is rendered in favor of the Williams awarding them $14,291.02 in damages. This includes $4,191.02 for the replacement of the fireplace, and $10,100.00 for the replacement of the remaining brickwork. The Williams failed to substantiate an expenditure of $105.81 they allege was spent to protect the roof while the fireplace was being redone, thus, they were not awarded that amount.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed and set aside. *50 It is now ordered, adjudged, and decreed that there be judgment in favor of the plaintiffs-appellants, Paul and Karen Williams, and against the defendant-appellee, Eddie Alfred, finding that he breached his implied warranty of good workmanship while conducting masonry labor for the Williams. It is further ordered, adjudged, and decreed that damages be awarded to the Williams in the amount of $14,291.02. The costs of this appeal are assessed against Eddie Alfred.
JUDGMENT OF TRIAL COURT SET ASIDE; JUDGMENT RENDERED IN FAVOR OF PLAINTIFFS.
NOTES
[1] The volume of a cubic yard is determined by multiplying its length by its width by its height. (V = 1 × w × h). The volume of a cubic yard equals twenty-seven cubic feet. (V = 3 × 3 × 3). Cubic feet are converted to cubic yards by dividing the number of cubic feet by twenty-seven. (Cubic feet ÷ 27 = cubic yards).