239 So.2d 450 (1970)
KEGLER'S INC.
v.
Arnold LEVY, d/b/a Modern Flooring Center.
No. 3856.
Court of Appeal of Louisiana, Fourth Circuit.
August 3, 1970.
Rehearing Denied October 5, 1970.
Writ Refused November 25, 1970.
*451 H. Alva Brumfield, Baton Rouge, Evangeline M. Vavrick, New Orleans, for plaintiff-appellant.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, H. Martin Hunley, Jr., New Orleans, for defendants-appellees.
Before REDMANN, BARNETTE and DOMENGEAUX, JJ.
REDMANN, Judge.
Plaintiff appeals from a judgment which, after trial on the merits, dismissed *452 on an exception of prescription his suit resulting from his dissatisfaction with carpeting furnished and installed by defendant.
In the course of constructing a building to house bowling alleys, pool tables and a lounge, plaintiff entered into a written contract with defendant under which defendant was to
"Furnish and install Roxbury `Herrick' quality 256 pitch, 9 wire, 2 ply, 250 Pile Height in a three frame Wilton 100% wool quality in a bowling alley pattern over Allen 56 oz. rubberized hair & jute padding * * *"
for the price of $11,165.
The installation was completed January 12, 1962, and the agreed price was paid.
About three months thereafter the carpet began to show wear in several areas, especially on a stairway. Defendant thereafter replaced the stairway and landing carpeting with rubber stair treads.
The condition of the other carpeting continued to worsen, and finally, on October 10, 1963, this suit was brought, seeking a return of the contract price and other damages.

Prescription
Plaintiff's suit was brought more than a year after both the installation of the carpet and the appearance of the defects in the carpeting. Thus if plaintiff's remedy (and only remedy) is an action for redhibition or for reduction of the price (and damages where the defect was known to the seller), the action is prescribed, LSA-C.C. arts. 2534, 2544, 2546.
Plaintiff titled its action as redhibition or quanti minoris, yet its petition recites the contract to furnish and install.
But in our opinion the contract to furnish and install wall-to-wall type carpeting is not a sale.
"The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
"Three circumstances concur to the perfection of the contract, to wit: the thing sold, the price and the consent." LSA-C.C. art. 2439.
"The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid." LSA-C.C. art. 2456.
"As soon as the contract of sale is completed, the thing sold is at the risk of the buyer * * *." LSA-C.C. art. 2467.
"The seller is bound to two principal obligations, that of delivering and that of warranting the thing which he sells." LSA-C.C. art. 2475.
The contract here could not realistically be said to have been perfected, and the carpeting to have become the property of plaintiff, and the risk of its loss to have been plaintiff's merely because of the agreement having been reached. Nor could defendant's obligations under the contract be described as to deliver and to warrant. In fact defendant did not have the carpeting in stock and had to have the manufacturer make it. But independent of that circumstance, defendant was obliged to cut the carpeting and padding to fit the areas to be covered, sew the seams and fix the material to the floor. This was no simple sale and delivery, as one might have with a loose, one-piece rug. In principle, the situation here appears to us similar to that of a contract to furnish and install vinyl or other tile flooring, which clearly would not be a contract of sale of the tile.
*453 Still, because the petition was titled and spoke of redhibition and asked for (among other things) return or reduction of the "purchase price", defendant argues the applicable prescription period is the one year for redhibition, citing American Ins. Co. v. Hartford Acc. & Indem. Co., 198 So.2d 757 (La.App.1967), cert. denied 251 La. 26, 202 So.2d 649. Defendant quotes from 198 So.2d at 763:
"It is therefore clear from an examination of the record that the plaintiff's contention that this is an action of contract, is not borne out by an examination of his pleadings, it being well settled the law of this State is that an applicable prescriptive period is to be determined by the character of the action as revealed by the allegations of the petition. Lewis v. Republic Supply Company, 155 So.2d 200 (La.App., 1st Cir. 1963); Victory Oil Company v. Perret, 183 So.2d 360 (La.App., 4th Cir. 1966). There is no question but an examination of the record clearly shows that the transaction involved herein was one of a sale and the relationship is one of buyer and seller."
In that case, however, as the last quoted sentence shows, the transaction there was a sale (of a piece of equipment), and nothing but a sale. The preceding language, relative to determining the applicable prescriptive period from the allegations of the petition, means only that the facts alleged (in stating a cause of action) determine the prescriptive period. Here the fact of a contract to furnish and install carpeting is alleged, and we consider this contract not one of sale. Plaintiff's characterization of his action as redhibition is not an allegation of fact.
The pertinent aspect of the Lewis case, cited in American Ins. Co., involved the sale of a wire cable. The allegedly defective cable had broken and caused damage for which the purchaser was sued. Holding the purchaser's third party demand one in redhibition prescribed by one year, the court observed, at 155 So.2d 206:
"* * * In the absence of allegations charging third party defendants with negligence, it may not be assumed the right asserted in the third party demand is an action by a tort feasor secondarily liable against a co-tort feasor primarily obligated to the injured party as was found in Appalachian Corporation v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539, or that, having an elective remedy in either tort or quasi contract, third party petitioner has chosen to sue upon the contractual obligation as was the case in Marquette Casualty Company v. Brown, 235 La. 245, 103 So.2d 269. As we view and understand the allegations of the third party petitioner before us, it asserts no more than the right of redhibition authorized by Articles 2534, 2545, and 2546, LSA-C.C."
Thus, although Lewis might be questioned as resurrecting "theory of a case" obstacles proscribed since 1961 by LSA-C.C.P. arts. 854, 862 and 2164 (and on its failure to treat as indemnity, see Minyard v. Curtis Products, Inc., 1967, 251 La. 624, 205 So.2d 422), nevertheless the ratio of Lewis itself was that the petition lacked allegations essential to any cause of action other than redhibition. That is not the case here.
In our opinion plaintiff's petition states a cause of action for breach of contract other than the contract of sale, and the claim is not prescribed.

Merits
On the merits, defendant claims it furnished carpeting in accordance with the specifications of plaintiff's architect, and that the carpeting wore out not because of any defect but because of lack of proper cleaning and maintenance.
Generally all experts agreed that the architect's specifications were suitable for carpeting for use in an establishment like *454 plaintiff's. Defendant testified that, of the various samples he submitted in precontract negotiations, some were "half the price of this and some a little more." While there was some dispute as to the under-padding's suitability and the source of its specification, the preponderance of the evidence is that it is highly suitable and probably moreso than the padding plaintiff argues should have been used. (Evidence suggestive of defendant having participated in drafting specifications includes a letter from the architect: "* * * We would appreciate your quoting us on a complete carpet installation * * *. We are interested in a stock commercial carpeting generally used in bowling houses. Please submit samples with your proposal, and feel free to quote on more than one quality.")
There was no evidence from either side of any scientific examination of the carpeting to determine whether it met the specifications, or to fix precisely the cause of its failure.
Defendant presented the testimony of Bennie H. Ray, who as a then employee of Service Master of New Orleans, Inc., had inspected the carpet in September 1963. Service Master was "in the house and office cleaning-maintenance business", "carpet and furniture cleaning-maintenance." The Chicago office of Service Master operates a "subsidiary service" called National Carpet Inspection Service. "We could go out  the mill or a retailer would call us in to go out and inspect the carpet and  as a third party, unbiased, and just take the facts as they were and then report them to them." The purpose of the requested inspections was "to either educate the consumer or to report the facts back to the factory so that it could be settled."
Ray's report, after describing the carpet as "250-3 ply" (perhaps an error since specifications were 2 ply), reads:
"Carpet worn in some restricted traffic areas and rotted out due to carpet being exposed to water in another area. Carpet in billiard area worn out around tables but especially on the end toward the bowling area; since that particular end is toward the alleys it was noted that as people shooting `pool' would wait for their shot they would come to the nearest end to the alleys and watch people bowl. This would account for the wear in one spot over the area around the rest of the table. Carpet down for one & half years with no professional maintenance (cleaning) build-up of grit & atmospheric soil was noted. Cost of professional cleaning would have been $400.00 which is only 3.6% of original investment."
Ray testified that (as of 20 months after installation) the carpeting had a heavy build-up of dirt and grit, some of which he had identified by magnifying glass as clam or oyster shell flakes which he said were very abrasive. The thrust of Ray's testimony was to blame lack of proper cleaning as the cause of the carpet's failure.
Yet Julian Fernandez, at the time of the carpet installation president of plaintiff corporation, testified that immediately after installation the carpets were professionally maintained by Universal Services, Inc., nationwide "feeding-housing-maintenance contractors", under an $1,800 per month "janitorial services" agreement. Invoices from Universal show that such services were billed from January 12 through March 11, 1962. Fernandez testified he personally checked daily to see that the maintenance services including daily vacuum-cleaning of the carpeting had been done. He said the maintenance contract called for daily vacuuming and monthly shampooing of the carpets. Materials invoices showed charges for rug shampoos and dry cleaning fluids, and for a $231 "JB-90 CV Vacmobile wet/dry w/attachments" and an $80 "Nylon Rug Shampoo Brush" (in addition to a $345 FM15 Clarke Deluxe Floor Polisher). We think Fernandez's testimony, supported by the invoices, justifies the conclusion that the carpeting was professionally maintained during its first two months. The professional maintenance arrangements were discontinued, Fernandez testified, *455 because plaintiff felt it could do its own maintenance with its own staff more economically; and Fernandez testified the daily vacuuming, inspected by himself, continued during his presidency approximately through 1963.
Also in evidence is a photograph of the carpeting in the pool tables area taken some two years after installation, which shows (as Ray had reported) considerable threadbareness principally at the end but also around toward the sides of the pool table. However, the end wear is not only much greater (which Ray suggested occurred because players waiting a turn went there to watch the bowling below the pool mezzanine), it is also between two strikingly straight and parallel lines perhaps a foot and a half to two feet apart, at that end of all four pool tables. The wearing out between parallel lines is suggestive of some inconsistency in the carpet fabric, since it is improbable that the bowling-watchers suggested by Ray would have remained within the narrow parallelogram area located perhaps three or four feet from the glass wall through which they would have watched the bowling.
In any case, there is proof of professional maintenance during the first two months, yet within three months the stairway carpeting showed such wear "you could see the backing coming through". And, about that time or shortly thereafter, defendant did replace the stairway carpeting with rubber stair treads, making it plain that that part of the carpeting must have been considered unsatisfactory by both parties. Yet, as of that time, the defense contention that failure to clean the carpeting caused its failure simply cannot be accepted.
Also in indirect conflict with the testimony of Ray concerning the heavy dirt and grit content of the carpet as of September 19, 1963, is the testimony of J. W. Abshire, Jr., who observed the carpeting a few months later, about March or April of 1964. At that time, Abshire testified, he repaired an area of carpeting by replacing it with carpet taken from under the stairway. He described the carpet as cleaner than in most commercial establishments.
In our opinion, the preponderance of the evidence, especially the circumstance of the carpet wearing so soon after installation, sufficiently proves that the carpet wore out because of some inherent insufficiency and unsuitability of either the carpet or the padding or both. Whether this unsuitability arose from inferior materials used in the carpet or padding, or from some defect in the weaving of the carpet or the assembly of the padding is not disclosed by the evidence. But defectiveness is shown by its wearing out as it did, and the testimony of the carpet people that the carpeting appeared to meet the specifications as to the numerical description of the weave cannot be accepted as proving the carpet met the specifications in view of their testimony that carpeting which met the specifications would have been suitable, which we think plainly means would not have worn out in three months. We conclude defendant did not supply the quality of carpeting and padding he contracted to furnish and install, and he is therefore liable for the damages his breach of contract caused.
Plaintiff would ordinarily be entitled to the cost of a proper performance of the entire contract since the evidence is that the wearing out was widespread throughout all carpeted areas. However, defendant had already replaced the stairway and landing carpeting with other material, and we think defendant is not responsible for other portions of the carpeting, already replaced, which had rotted out because of water from the front door and from air conditioning machinery. From the testimony as to the other areas, and from the architect's plans showing measurements of the stairway, we are satisfied that these areas amount to definitely less than one fourth of the total carpeted area of 720 square yards and we will therefore award three-fourths of the cost of a complete performance.
*456 Since, according to the architect's testimony, defendant's contract price was the lowest bid received, it fairly shows the minimum price for which plaintiff could have carpeting furnished and installed in accordance with the contract specifications. There is no evidence of change in material or labor costs since installation, and no estimates from contractors based on costs as of the time of this suit. Accordingly we will base our award on defendant's contract price of $11,165.
Plaintiff's demand for other damages was not proven, and it is not entitled to attorney's fees under the contract.
Accordingly the judgment appealed from is reversed, and judgment is rendered in favor of plaintiff, Kegler's, Inc., and against defendant, Arnold Levy, doing business as Modern Flooring Center, in the full sum of eight thousand three hundred seventy-three and 75/100ths dollars ($8,373.75), with interest from judicial demand, and all costs.
Reversed and rendered.