479 So.2d 1029 (1985)
Essay J. HEBERT, Jr., Plaintiff-Appellee,
v.
Wallace McDANIEL, d/b/a Wallace McDaniel Welding Works, Defendant-Appellant.
No. 84-956.
Court of Appeal of Louisiana, Third Circuit.
December 11, 1985.
*1031 Wade A. Mouton, Kaplan, for defendant-appellant.
James E. Fontenot, Abbeville, for plaintiff-appellee.
Before FORET, YELVERTON and KING, JJ.
FORET, Judge.
In this suit for damages incurred as a result of a breach of a construction contract, the main issue is whether the roof was repairable as opposed to replaceable. Plaintiff, Essay J. Hebert, Jr. (Hebert), contracted with defendant, Wallace McDaniel, d/b/a Wallace McDaniel Welding Works (McDaniel), to have a metal building constructed on his property. Plaintiff contends that defendant's faulty workmanship caused the roof and other parts of the building to leak. The trial court found the leaks to be the result of defendant's faulty construction and awarded plaintiff the cost of replacing the roof ($10,400), two windows ($300), and the cost of long-distance phone calls expended in connection therewith ($25.81). Defendant has appealed, urging four specifications of error.

FACTS
On or about May 17, 1979, Hebert and McDaniel entered into a building contract. Hebert gave McDaniel the dimension specifications for the metal building, and McDaniel agreed to construct it at a cost of $23,286. Construction commenced on June 6, 1979, and the building was completed approximately two months later. McDaniel was paid in full at the time the building was completed.
During a rainstorm approximately one month after the building was completed, the building began to leak through the roof ledge onto the east and west sides throughout the entire structure and through the main door and windows. Hebert called McDaniel after this first rainstorm, and McDaniel and his crew arrived the following day in an attempt to seal and caulk to prevent further leakage. Unfortunately, the leaks persisted. Hebert continued to call McDaniel, and McDaniel continued to make several, apparently good-faith, attempts to repair the leaks.[1] Because the *1032 problems worsened after every attempt to repair, Hebert requested that McDaniel cease his attempts. During his last telephone conversation with McDaniel, Hebert asked McDaniel to decide on how he was going to correct the leakage problems. McDaniel was never heard from again.
A catalog of defects appears from the record: the incorrect door was installed in the 10 ft. x 10 ft. opening and thereafter another door was installed; the leaks persisted and defendant had the overhead door company try to stop the leaking; the gutters leaked due to improper installation resulting in rusted metal sheeting around the areas which leaked; vents were improperly installed with leaking as a result; the roofing screws were improperly tightened, and they were responsible for some of the leaks; a weather-approved caulking was never used; there were pinholes in the peaks of the roofcaps; the overhang was not long enough; the window flashing was improperly installed; the lap sheets were not properly caulked, and as a result, the insulation must be changed, the rusted metal sheeting must be replaced, the windows must be repaired, and some of the secondary structure also needs replacing. A litany of these problems with the building continued for five years, and none of defendant's stop-gap efforts were successful. Hebert, disgusted and worn out from several years of moving pots, pans, and pails around the attic and home, finally filed suit. One portion of the building has never been used as intended, due to the leaking.[2]
After not having heard from defendant for several months, Hebert requested estimates for the repair or replacement of the roof from several contractors. However, most of the metal building contractors he consulted would not guarantee repairs to the building and would only bid on replacing the entire roof. The contractors apparently were of the opinion that the only remedy was to replace the entire roof.
Hebert built a $70,000 home within the metal building structure. All of the woodwork was done around the metal building structure and no alterations were made to the building constructed by McDaniel. The stud walls follow the sides of the metal building all around. Plaintiff testified that thirty-nine leaks were detected in July of 1981. The leaks were so severe that even the carpet was wetted. However, plaintiff has not claimed any damages to his home. He has only requested that the roof be replaced.

THE ISSUES
Defendant has advanced four specifications of error which may be condensed into two major issues: whether or not the roof in question was repairable as opposed to replaceable, and whether or not this is a contract to build as opposed to a contract for the sale of a building. Appellant contends that this was a sale, and that therefore the court should have sustained its peremptory exception of prescription.
We believe this is a case which involves a contract to build as opposed to a contract for the sale of a building. Three major factors are used to determine whether or not a contract is one of sale or one to build: (1) The buyer has some control over the specifications of the object, (2) the negotiations generally take place before the object is constructed, and (3) the parties contemplate that one of them will supply the materials and his skill and labor in order the construct the specified object. Duhon v. Three Friends Homebuilders Corp., 396 So.2d 559, 561 (La.App. 3 Cir. 1981); Keglers, Inc. v. Levy, 239 So.2d 450 (La.App. 4 Cir.1970), writ denied, 256 La. 1150, 241 So.2d 253 (1970); Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961).
In this case, Hebert asked McDaniel to build the structure according to his specifications. *1033 He and McDaniel discussed the project on several occasions prior to the commencement of construction in June of 1979. McDaniel contracted to provide the materials and his skill and labor to build the housing. Consequently, we hold, as did the learned trial judge, that the contract entered into between the two was a building contract as opposed to a contract of sale. Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (1967).
In brief, appellant argues that this is a redhibitory action and that prescription has run on Hebert's cause of action. However, the law in Louisiana is that redhibition applies only to contracts of sale and not to contracts to build. Duhon v. Three Friends Homebuilders Corp., supra; Caubarreaux v. Hines, 442 So.2d 898 (La.App. 3 Cir.1983), writ denied, 446 So.2d 1225 (La.1984); Catalina Pools v. Sellers, 322 So.2d 812 (La.App. 4 Cir.1975); LSA-C.C. Art. 2762. Because we have found this is a contract to build, redhibition is not applicable.
LSA-C.C. Art. 2756 defines a construction contract as:
"To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price."
Because the contract in the present suit is a construction contract, the rights and obligations of the parties are governed by C.C. Arts. 2756, 2762, 2768 and 2769.
"It is implied in every building contract that the work of the builder be performed in a good workmanlike manner, free from defect either in material or workmanship. Nichols Ford Co., Inc. v. Hughes, 292 So.2d 345 (La.App. 2nd Cir. 1974).
"The basic law in regard to a contractor's liability for failure to properly perform a building contract is found in LSA-C.C. Art. 2769..."

Neel v. O'Quinn, 313 So.2d 286, 289 (La. App. 3 Cir.1975), writ denied, 319 So.2d 440 (La.1975).
See also Caubarreaux v. Hines, supra, at 900; Maxwell v. Bernard, 343 So.2d 431, 434 (La.App. 3 Cir. 1977), and cases cited therein; Melder v. Gassiott, 436 So.2d 628 (La.App. 3 Cir.1983); McQuiston v. Simon, 457 So.2d 271 (La.App. 3 Cir.1984); Liberda v. Acadiana Roofing & Sheet Metal Co., Inc., 427 So.2d 504 (La.App. 3 Cir. 1983), writ denied, 433 So.2d 1047 (La. 1983); Walter Lafargue Real Estate, Inc. v. Raines, 420 So.2d 1309 (La.App. 3 Cir. 1982); DeCuir v. Sam Broussard, Inc., 459 So.2d 1375 (La.App. 3 Cir.1984).
LSA-C.C. Art. 2769 states:
"If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."
This article dictates that every contract for work or services contains an implied obligation of performance in a good workmanlike manner in default of which the contractor must respond in damages for any losses which may ensue. Tiger Well Service, Inc. v. Kimball Production Co., 343 So.2d 1153 (La.App. 3 Cir. 1977).
The plaintiff's burden of proof in such a case is to prove that a defect exists and that the defect came about as a result of faulty workmanship or materials. Neel v. O'Quinn, supra; Melder v. Gassiott, supra; Tiger Well Service, Inc. v. Kimball Production Co., supra; Bico Enterprises, Inc. v. Cantrell, 413 So.2d 260 (La.App. 3 Cir.1982). A roof which leaks is a defective roof. Stream v. LeJeune, 352 So.2d 714 (La.App. 3 Cir.1977); Goudeau v. Hill, 410 So.2d 338 (La.App. 4 Cir.1982).
Under Louisiana law, if the defects are such that they cannot be corrected except by removing and replacing the construction, the owner may require the contractor to remove the object from his land and restore the premises to its prior condition. Additionally, the owner is entitled to damages. Caubarreaux v. Hines, supra, at 900; Martin v. AAA Brick Company, Inc., 386 So.2d 987 (La.App. 3 Cir.1980), citing Neel v. O'Quinn, supra, at 290, and cases cited therein.
*1034 The trial court found that McDaniel had breached the implied warranty of good workmanship in the building contract at issue and that defendant was liable to plaintiff. The trial judge gave oral reasons for judgment which stated that:
"... the leaks were caused by the faulty workmanship and construction of the roof, principally, by the defendant and that as a result, in order to remedy these defects, which in the Court's opinion are substantial, it is necessary that a new roof be placed on the building."
After reviewing the record, we conclude that the roof was defectively constructed and unsuitable for its intended use.
Mr. Allen Roy Baudoin, a metal construction expert, has many years experience as a roof and sheet metal man. He inspected the roof personally and was once present while the roof was actually leaking. Many photographs of the roof and of the interior of the structure were introduced into evidence. These photographs and the expert's testimony support the trial judge's conclusions. Because we find the trial judge's conclusions are clearly supported by the evidence and are not manifestly erroneous, his judgment will remain undisturbed.
The expert testimony adduced at trial in regard to the necessary work to remedy the defects in workmanship was given by Mr. Baudoin. He stated that he would need to replace the entire roof and various other portions of the building. Since the roof is of little or no value in its present state, he submitted an estimated cost for the removal and reconstruction of the roof.
Considering all the evidence introduced as a whole, we believe the record reflects that the work was not properly performed. For this reason, we believe that Hebert is entitled to damages.
The appropriate measure of damages as a result of a breach in this contract case is: what will it take to place Hebert in the position he deserved to be in when the building was completed. After an examination by the trial judge, the expert witness stated that, in his opinion, in order to stop the leaks in plaintiff's building, the entire roof needed replacing. He stated that there was no other way he could repair the leaks with certainty and guarantee it. If the roof were merely repaired, he would not be able to guarantee how long it would be free from leaks.
The record reflects that both parties agreed as to the extent of the defects. In fact, in response to his counsel's direct examination, McDaniel responded to the following questions:
"Q. Mr. McDaniel, do you feel in your opinion that the roof should have been changed?
A. Right.
Q. What was the reason for that?
A. Because we had done been on top too many times. The more you get on it, the worse it gets."
The foreman on the job, McDaniel's son, responded to questioning:
"Q. Do you feel that the problem could be corrected at this time without changing the roof?
A. No."
After making such a statement, the foreman stated that it could have been fixed, "It could be fixed, which we tried."
Although the record reveals that the defendant made innumerable good faith efforts to repair the metal roof, none were successfulin fact they even worsened the state of the roof. After listening to the various methods of roof repair described, the court was obviously impressed with the necessity of replacing, as opposed to repairing, the roof. The record reflects that the defects were the result of faulty workmanship, and, therefore, we believe that the plaintiff has carried his burden of proof by a preponderance of the evidence.
Defendant further contends that plaintiff's award should be reduced for failure to mitigate his damages. However, plaintiff has not claimed any damages other than those to the actual structure which *1035 defendant constructed.[3] The record reflects that plaintiff set up an elaborate system of pans and pails to catch the streams of water pouring out of the leaks. Plaintiff actually called defendant every time it rained to give him an opportunity to repair the problems before further damage was incurred. In addition, plaintiff called several contractors to bid on repairs, but none wanted to become involved and all refused the job. It appears that plaintiff used reasonable and, not only ordinary, but extraordinary diligence in trying to minimize his damages. A substantial expenditure may have minimized plaintiff's loss i.e. replacing the roof. However, because the leaks occurred as a result of defendant's faulty workmanship, he should be the one to bear the expense of the correction of the problems. After all, it was defendant's duty to performnot plaintiff's.
Defendant did make several attempts to repair the roof, but there is no evidence offered by defendant to explain what else he expected Hebert could have done to arrest the leaks. Because defendant had the duty to perform primarily, and he had equal knowledge of the consequences if the leaks were not corrected and he had the opportunity to perform, plaintiff should not have to bear the expense of correcting the defects. Unverzagt v. Young Builders, Inc., 252 La. 1091, 215 So.2d 823 (1968).
The evidence does reveal that Hebert did not want to replace the roof unless absolutely necessary. We believe that Hebert had a good reason for his refusal. Considering the fact that he had built a $70,000 structure within the metal building and considering what is involved in replacing the roof, plaintiff appears to have been justified. Defendant also offered to put a sealer on the roof, however, plaintiff refused. The expert testimony reveals that the sealant is only effective for a limited period of time.
For all of the above mentioned reasons, we believe that the leaking roof is a defect and that that defect was a result of work which was not performed in a good workmanlike manner. Consequently, the roof must be replaced as opposed to repaired, and the trial court's judgment is affirmed.
Costs of this appeal are assessed against defendant.
AFFIRMED.
NOTES
[1] Three large vents in the roof leaked profusely. McDaniel replaced the vents with others of smaller diameter. However, the leaking continued and the new vents made the building warmer because of the restricted air flow. Workmen used silicone sealant and caulking on the roof to no avail. The incorrect type of overhead door, from which leaking occurred, was replaced, but the leaks persisted in that area also.
[2] Hebert told McDaniel that the purpose of the building was to construct a home within and to use one end of the building as a parts department and a diesel engine exhibit room.
[3] Plaintiff did claim damages for anxiety and inconvenience, but the trial court disallowed them.