**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**September 10, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-30387

XL SPECIALTY INSURANCE COMPANY,

Plaintiff-Appellee-Cross-Appellant,

VERSUS

BOLLINGER SHIPYARDS LOCKPORT LLC,

Defendant-Appellant-Cross-Appellee.

NAVIGATORS INSURANCE COMPANY, INC.

Plaintiff-Appellee-Cross-Appellant,

VERSUS

BOLLINGER SHIPYARDS LOCKPORT LLC,

Defendant-Appellant-Cross-Appellee.

Appeals from the United States District Court
For the Eastern District of Louisiana
(01-CV-623)

Before HIGGINBOTHAM, EMILIO M. GARZA, and DENNIS, Circuit Judges.

1

PER CURIAM:[*]

These consolidated declaratory judgment actions sounding in diversity were brought by the primary and excess general liability insurers of a Louisiana shipbuilding company. The insurers seek a declaration that they are not obliged to pay certain repair costs or loss of profits or use paid by the shipbuilder to its customers. In counterclaims, the shipbuilder seeks approximately $7 million in coverage. The district court granted summary judgment for the insurers but ordered each party to bear its own costs. All parties appealed. We now AFFIRM summary judgment, VACATE the denial of attorney fees and costs, and REMAND for further proceedings consistent with Part IV of this opinion.

I.

Bollinger Shipyards Lockport, LLC ("Bollinger"), built three lift boats for Cardinal Services ("Cardinal") under a "Vessel Construction Agreement."[1] It built one lift boat for Montco, Inc. ("Montco"), under a "Construction Contract." These contracts warrantied workmanlike performance but limited Bollinger's obligation to repair and replace defects to those problems arising from faulty workmanship discovered within 180 days of delivery and

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] A liftboat is a supply vessel equipped with three or four hydraulic "jack-up" legs, which can be lowered and secured on the seabed so that the boat can be raised out of the water.

reported to Bollinger within 180 or 210 days of delivery.[2]  The agreements expressly disclaimed any obligation on the part of Bollinger for consequential damages, including loss of profits and/or use.  The Cardinal contract stated that the warranty was "in lieu of all other express or implied warranties."  The Montco contract stated that all other warranties by Bollinger were "expressly excluded and negated."

The three lift boats that Bollinger built for Cardinal under the "Vessel Construction Agreement" are the J. HANKINS, the W. LOPEZ, and the P.G. JONES.[3]  The boat built for Montco under the "Construction Contract" is the TAMMY.  The TAMMY was completed on May 15, 1997; the J. HANKINS on June 12, 1997; the W. LOPEZ on January 15, 1998; and the P.G. JONES on February 27, 1998.[4]

On July 27, 2000, a crew member of the P.G. JONES noticed water seeping from one of the vessel's jack-up legs.  The boat was taken to a Bollinger facility, where further inspection revealed cracks in each of its legs.  Bollinger began repairs on August 1, 2000.  The parties do not dispute that it was quickly determined

---

[2] Montco's contract with Bollinger gave it 180 days to report defects.  Cardinal's contract gave it 210 days.

[3] The J. HANKINS has a benighted history.  It was launched as the D.L. HANSEN, capsized, and was launched again as the J. HANKINS. During its post-capsize repair, one of its legs was replaced.

[4] The parties do not identify the precise dates on which each vessel was delivered.  In the absence of any suggestion to the contrary, we assume that each vessel was delivered close to the date of its completion.

that Bollinger had performed faulty welds during the original construction of the vessels; that the defective welding had, at some point, resulted in cracks in the gear racks attached to the legs; and that this cracking had propagated into the legs. The W. LOPEZ, the J. HANKINS, and the TAMMY were subsequently inspected and discovered to have similar cracks.[5] Bollinger began repairs on the J. HANKINS on August 14, 2000. In a letter dated August 19, 2000, Bollinger informed Cardinal that it was "ready, willing, and able" to repair "weld cracking" on the W. LOPEZ. Ultimately, Bollinger replaced a total of ten legs on four vessels, at a cost of approximately $4.5 million.

Bollinger owned a comprehensive general liability ("CGL") policy issued by XL Specialty Insurance ("XL Specialty") that provided coverage between July 1, 2000, and October 1, 2001. The policy provided primary liability coverage for sums that Bollinger became "legally obligated to pay as damages" because of "property damage" that was caused by an "occurrence" during the policy period. It further provided that XL Specialty had "the right and duty to defend any 'suit' seeking these damages," defining "suit" as "a civil proceeding in which damage because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies are alleged."

---

[5] The cracks in the J. HANKINS were discovered on August 13, 2000; those in the W. LOPEZ on August 18, 2000; and those in the TAMMY on September 18, 2000.

4

Bollinger also purchased $25 million worth of excess CGL coverage for the policy period October 1, 1999, to October 1, 2001. The excess coverage was subscribed to by XL Specialty, Navigators Insurance Company, Inc. ("Navigators"), and National Union Fire Insurance Company.[6] This umbrella policy also covered sums that Bollinger became "legally liable to pay." Its terms were essentially identical to those of the primary coverage.

On August 18, 2000, Bollinger's insurance agent, Willis of Louisiana, Inc. ("Willis"), notified XL Specialty's managing general partner, Trident Marine Managers, Inc. ("Trident"), of a new CGL claim involving vessels Bollinger had built for Cardinal and Montco. On August 30, 2000, Willis sent a notice of loss to Trident. The notice stated that four vessels built by Bollinger had "sustained cracks in some of the legs" sometime "after 10/1/98." It did not identify any related claims, demands, or suits. On August 31, 2000, Willis informed Trident that Bollinger had begun to repair the vessels because it believed it bore responsibility for the damages: "Bollinger has investigated the matter and . . . feels responsible for the damages."

On September 18, 2000, Cardinal issued a written demand to Bollinger relating to Bollinger's "breach of its vessel construction contracts." The demand letter specifically stated

---

[6] Navigators provided 50% of the excess coverage; XL Specialty provided 30%; and National Union provided 20%. National Union is not a part of these proceedings.

that Cardinal's remedies against Bollinger lay "in contract rather than in tort."

At some point, Montco's president told Bollinger's chairman that his company expected the shipbuilder to pay for repairs to the TAMMY, as well as for its downtime. According to the testimony of Montco's president, Bollinger's chairman agreed to the demand, even though he questioned his company's obligation to do so under the terms of the Construction Contract.

On September 19, 2000, Trident acknowledged its receipt of the loss notice sent by Willis on August 30. Following additional correspondence, Trident sent Bollinger a reservation of rights letter on September 25, 2000, reserving the insurers' right to contest coverage.

On November 2, 2000, Bollinger notified Cardinal that it would pay up to $1.5 million to cover loss of use of the W. LOPEZ, the J. HANKINS, and the P.G. JONES, in the event that its insurers denied coverage. On February 13, 2001, Bollinger notified Montco that it would pay $875,000 to cover loss of use of the TAMMY, in the event that its insurers denied coverage. Bollinger and Montco entered into a formal settlement agreement on June 28, 2001. Bollinger and Cardinal entered into such an agreement on July 25, 2001. Subsequently, Bollinger entered into new agreements with both Cardinal and Montco to build additional vessels. Those agreements

were worth approximately $33 million.[7]

On March 9, 2001, XL Specialty filed suit seeking a declaration of its rights and obligations. On March 13, 2001, it denied Bollinger's claim. Bollinger filed a counterclaim seeking coverage and bad faith damages. Navigators also filed a declaratory judgment action contesting coverage, in response to which Bollinger filed a counterclaim. The suits were consolidated. All parties moved for summary judgment. The district court granted summary judgment for the insurers but denied costs.

Bollinger appeals from the court's judgment finding a lack of coverage. The insurers appeal from the court's order that the parties bear their own costs.

## II.

We review a grant of summary judgment de novo, applying the same standard as the district court.[8] We likewise review matters of contract interpretation de novo.[9] Summary judgment is appropriate if the movant demonstrates that there are no genuine issues of material fact and that it is entitled to a judgment as a

---

[7] The insurers believe that Bollinger was eager to pay for Cardinal's and Montco's repairs and down time in order to preserve such future sales.

[8] GeoSouthern Energy Corp. v. Chesapeake Operating Inc., 274 F.3d 1017, 1020 (5th Cir. 2001).

[9] T.L. James & Co. v. Traylor Bros. Inc., 294 F.3d 743, 746 (5th Cir. 2002).

matter of law.[10]   Thus, "summary judgment is appropriate if the nonmovant fails to establish facts supporting an essential element of his prima facie claim."[11]

### III.

### A.

The policies at issue limited coverage to those sums that Bollinger was "legally obligated to pay as damages."[12]   Because the record does not reasonably support the finding of a factual basis upon which Bollinger could potentially be liable to Cardinal or Montco, we conclude that there was no coverage under the policies.[13]

The contracts under which Bollinger constructed the lift boats included express warranty provisions limiting Bollinger's obligation to repair and replace defects to those problems discovered and reported within 180 or 210 days of delivery.   The lift boats were completed and delivered in 1997 and 1998, and the defective welds were discovered between July 27, 2000, and

---

[10] Fed. R. Civ. P. 56(c).

[11] GeoSouthern Energy, 274 F.3d at 1020.

[12] Bollinger contends that the insurers merely attempt to "re-litigate the underlying claims between Bollinger, on the one hand, and Cardinal and Montco, on the other, by arguing that Bollinger could not have been found liable had the case proceeded to trial." Because neither Cardinal nor Montco ever filed a lawsuit against Bollinger, however, no case between the parties existed; none was litigated; none could have proceeded to trial; and none can be "relitigated."

[13] For this reason, we need not consider the other triggers to coverage—whether there was "property damage" that was caused by an "occurrence" during the policy period.

8

September 18, 2000.  Hence, the express warranties had expired before the cracking in the jack-up legs was discovered and reported.    Furthermore, the construction contracts expressly precluded any obligation by Bollinger for consequential damages, including loss of profits and use.    Because the warranty limitations included in the contracts were allowable under Louisiana law,[14] neither Cardinal nor Montco had a valid warranty claim against Bollinger.  Accordingly, Bollinger faced no potential liability in contract.

Bollinger argues that it was subject to potential liability for breach of the implied warranty against redhibitory vices and defects. We disagree.  Under the Louisiana Civil Code, redhibition is the rescission of a sale on account of a defect in the manufacture or design of a thing sold:

> The seller warrants the buyer against redhibitory defects, or vices, in the things sold.
>
> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect.  The existence of such a defect gives a buyer the right to obtain rescission of the sale.[15]

Because redhibition is the avoidance of a sale, there can be no

---

[14] See FMC Corp. v. Continental Grain Co., 355 So. 2d 953, 957–58 (La. App. 4th Cir. 1977).

[15] La. Civ. Code art. 2520; see also Patin v. Thoroughbred Power Boats Inc., 294 F.3d 640, 655 (5th Cir. 2002); see generally Saúl Litvinoff, Sale and Lease in Louisiana Jurisprudence 439–40 (4th ed. 1997) (discussing the general principles of the warranty against redhibitory vices and defects).

redhibition in the absence of a contract of sale.[16]

We find that there is no genuine issue of material fact about the nature of the contracts under which Bollinger built the lift boats for Cardinal and Montco. They were contracts to build. The record unequivocally shows that the vessels were built to the specifications of Cardinal and Montco; that both contracts were negotiated; and that Bollinger supplied the skill, labor, and materials.[17] Because the contracts between Bollinger and both Cardinal and Montco were contracts to build rather than contracts of sale, and because redhibition is not applicable to construction contracts, Bollinger faced no potential liability for a breach of

---

[16] Airco Refrigeration Serv., Inc. v. Fink, 134 So. 2d 880, 883 (La. 1961) (explaining that Article 2520 applies only to contracts of sale); Hebert v. McDaniel, 479 So. 2d 1029, 1033 (La. App. 3d Cir. 1985) ("[T]he law in Louisiana is that redhibition applies only to contracts of sale and not to contracts to build."); Duhon v. Three Friends Homebuilders Corp., 396 So. 2d 559, 560 (La. App. 3d Cir. 1981) (same, citing La. Civ. Code art. 2520).

[17] See La. Civ. Code art. 2756 ("To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price."); Airco Refrigeration, 134 So. 2d at 882 (citing art. 2756); Hebert, 479 So. 2d at 1032 ("Three major factors are used to determine whether or not a contract is one of sale or one to build: (1) The buyer has some control over the specifications of the object, (2) the negotiations generally take place before the object is constructed, and (3) the parties contemplate that one of them will supply the materials and his skill and labor in order the construct the specified object."); Duhon, 396 So. 2d at 561 (same); see generally Swope v. Columbian Chems. Co., 281 F.3d 185, 202-04 (5th Cir. 2002) (explaining that under Louisiana law "[t]he distinction between obligations to give, e.g., sales, and obligations to do, e.g., building constructions, is material to the judicial determination of questions involving . . . remedies").

the warranty against redhibitory vices and defects.[18]

In sum, we find that there was no coverage of Bollinger's claim because it was not potentially obligated to pay the sums it expended on repairs and paid to Cardinal and Montco for down time.

B.

Bollinger contends that the insurers forfeited their right to invoke the coverage limitation imposed by the phrase "legally obligated to pay as damages" because they refused to defend Bollinger against Cardinal's and Montco's claims and then denied coverage. This argument is meritless. By its terms, the primary insurance policy required XL Specialty to provide a defense only for any "suit" seeking damages.[19] Because neither Cardinal nor Montco named Bollinger in a "suit," defined in the policy as a "civil proceeding," there was no duty to defend.[20] In any event,

---

[18] Bollinger asserted at oral argument that the replacement leg used in reconstructing the J. HANKINS was purchased pursuant to a contract of sale, thus suggesting that Cardinal had a redhibition claim as to that leg. But because it identifies no record evidence supporting its assertion, there is no triable issue of such a redhibition claim. Likewise, the record evidence does not support Bollinger's argument that it faced liability for an unnamed tort, the elements of which it does not articulate.

[19] The excess insurers had only a secondary duty to defend. See American Home Assurance Co. v. Czarniecki, 230 So. 2d 253 (La. 1969); see also William Shelby McKenzie & H. Alston Johnson III, 15 Louisiana Civil Law Treatise: Insurance Law & Practice § 214 (1986).

[20] Even if there had been a suit based on Cardinal's and Montco's demands for contract damages, there would not have been a duty to defend because those demands, construed as the allegations of a hypothetical legal petition, "unambiguously excluded coverage" for the reasons stated above. See Cuté-Togs of New Orleans, Inc. v.

11

the wrongful denial of a defense would not have <u>expanded</u> coverage.[21]

Finally, in response to Bollinger's assertion that its settlement was reasonable, we note that Bollinger assumed responsibility for the damages almost immediately after they were discovered and negotiated down-time compensation with Cardinal and Montco long before the insurers denied coverage. Bollinger may have made an astute business decision in paying for Cardinal's and Montco's losses. But Bollinger cannot transfer costs it was not legally obligated to pay to the insurers.[22]

## IV.

The insurers complain that the district court erroneously ordered the parties to bear their own costs. "[C]osts . . . shall be allowed as of course to the prevailing party unless the court

---

<u>Louisiana Health Serv. & Indem. Co.</u>, 386 So. 2d 87, 89 (La. 1980) ("[T]he insurer's duty to defend suits brought against its insured is determined by the allegations of the injured plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excluded coverage." (quoting <u>Czarniecki</u>, 230 So. 2d at 259)).

[21] <u>See</u> <u>Enserch Corp. v. Shand Morahan & Co.</u>, 952 F.2d 1485, 1493 (5th Cir. 1992) (explaining that even in the face of a breach of the duty to defend, coverage "cannot be created <u>ex nihilo</u> by estoppel" (quoting <u>Hartford Cas. Co. v. Cruse</u>, 938 F.2d 601, 605 (5th Cir. 1991)); <u>see also</u> <u>Foster v. Hampton</u>, 352 So. 2d 197, 203 (La. 1979) (stating the basic rule that there can be no liability on the part of an insurer where there is no liability on the part of its insured).

[22] Because we hold that Bollinger cannot establish coverage, we need not consider whether it is entitled to damages for the wrongful denial of coverage.

12

otherwise directs . . . ."[23]  Our cases recognize that there is a strong presumption that the prevailing party will be awarded its costs.[24] While the court has wide discretion to award or deny costs,[25] it must provide reasons if it denies costs.[26]  Because the district court here did not provide reasons, we vacate that portion of the judgment ordering each party to bear its own costs and remand for either an award of costs to the prevailing parties or an explanation of reasons for the denial of such an award.

V.

For the foregoing reasons, we AFFIRM summary judgment, VACATE the denial of attorney fees and costs, and REMAND for further proceedings consistent with Part IV of this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.

---

[23] Fed. R. Civ. P. 54(d)(1).

[24] Sheets v. Yahama Motors Corp., USA, 891 F.2d 533, 539 (5th Cir. 1990).

[25] Hall v. State Farm Fire & Cas. Co., 937 F.2d 210, 216 (5th Cir. 1991).

[26] Sheets, 891 F.2d at 539.